THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* VICTOR GOMEZ, Defendant-Appellant.

First District (5th Division)    No. 80-1440

Opinion filed June 11, 1982.

James J. Doherty, Public Defender, of Chicago (Ronald P. Alwin and John Thomas Moran, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Harry John Devereux, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendant was convicted in a bench trial of murder and attempted armed robbery and sentenced concurrently to 25 to 45 years on the former and 4 to 12 years on the latter. On appeal, he contends that (1) he was not proved guilty of the offenses beyond a reasonable doubt; (2) he was not informed of a State rebuttal witness to his alibi defense; and (3) the trial court erred in not granting immunity to a defense witness.

Rubin Mercado (Rubin), stepson of Manuel Darang, the murder victim, testified that on July 22, 1976, he was in his stepfather's well-lighted grocery store and standing close to him when two men entered about 9 p.m.; that one of the men began looking at comic books near the cash register, about 1½ feet in front of him (Rubin), while the other circled the interior of the store; that after some children left the store, defendant—whom Rubin identified in court as the man near the comic books—drew a

gun and said, "Freeze, it's a holdup"; that Darang told defendant "to take the money"; that he (Rubin) was facing defendant when those statements were made; that as Darang turned to touch Rubin, defendant fired two shots at him; that the other man, who was then coming toward Rubin behind the counter, caught Darang and placed him on the floor, and the two men then ran out of the store; that defendant was about 5 feet 10 inches tall and had an Afro haircut and a beard; that as he (Rubin) ran out to tell his mother what had happened, two girls came in; and that about a month later he identified defendant in a lineup.

On cross-examination, Rubin testified that at the time of the occurrence, defendant "had an Afro and a little beard"; that he did not tell a police officer shortly after the shooting that the only description he could give of the offenders was that they were Latin and the one with the gun had an Afro and was between 20 and 25 years of age; that at trial, defendant was heavier and had a fuller beard; that he remembered nothing about defendant's clothing but thought he was tall for a Latin; that he was watching television when the men came in, looked up at them for about one second, and went back to watching television; that he looked up again when defendant drew a gun; that about five minutes elapsed from the time the men came in until defendant pulled the gun and another five minutes until the men ran out; that it was a matter of seconds after defendant said, "Freeze, it's a holdup" until he fired the gun; and that while the men were in the store he had a clear view of defendant for approximately one minute.

Naomi Darang, Rubin's mother, testified that she arrived shortly after the incident and found her husband dead; and that, when she had seen him earlier in the evening, he was wearing a pistol in a hip holster but the gun and holster were missing after the occurrence and never located.

Ivette Rodriguez (Ivette) testified that she had known defendant for 12 years; that on July 22, 1976, she was driving her mother's car accompanied by her girl friend, Sonia Gonzalez (Sonia); that at 7:30 p.m., near Humboldt Park, which was approximately two blocks from the murder site, she saw defendant, blew her horn, and pulled over; that defendant crossed the street and talked with her and Sonia; that they decided to go to Chicago's Old Town, and defendant got into the car; that on the night in question, from 7:30 to 10:30 when Sonia was taken home, defendant was not out of their sight except for a few minutes when he was inside a gas station; and that she (Ivette) and Victor were together constantly until 1 a.m., driving around Chicago.

Sonia Gonzalez gave substantially similar testimony about the events of the night in question.

Asserting that he was not in the grocery store at the time of the shooting and denying that he killed Darang, defendant testified that about

6 p.m. on the evening of July 22, he was with some friends in Humboldt Park; that at about 7:30 or 7:35, he left in a car with Ivette and Sonia; that they arrived at a gas station at about 8 p.m. and stayed for 15 minutes; that they then drove to Old Town and left at 9:45 or 10 p.m. to take Sonia home; that he was not in Darang's grocery store between 8:30 and 10 p.m. and was not out of the sight of Ivette and Sonia from 7:30 to 10 p.m.; that about a month later he was in a lineup, wore a full goatee, and had tattoos on both arms; and that, on the night in question, both arms were uncovered. On cross-examination, defendant testified that he had been in the store at around 5 p.m. on the evening of July 22.

Officer Frank Musial testified in rebuttal that on July 23, 1976, he interviewed Ivette Rodriguez who told him that she first saw defendant at 9 p.m. on the night of the incident. On cross-examination, he testified that he had not made a report of the incident and that Ivette had told him that she, defendant, and another woman drove around Old Town on the night of July 22.

OPINION

Defendant first contends there was a failure to prove his guilt beyond a reasonable doubt. He maintains that the identification by Rubin Mercado, the sole occurrence witness, was vague and uncertain and was not convincing as to his guilt. We disagree.

The testimony of a single credible witness who had ample opportunity to make a positive identification is sufficient evidence to convict (*People v. Williams* (1981), 96 Ill. App. 3d 8, 420 N.E.2d 710), even though such testimony is contradicted by the accused (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631). The credibility of identification witnesses and the weight accorded their testimony rests with the trier of fact (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847) and, in that capacity, consideration is given to such factors as the amount of time the witness had to observe the offender, the proximity to him, and the adequacy of the lighting (*People v. Baker* (1979), 78 Ill. App. 3d 411, 396 N.E.2d 1174). However, evidence of alibi cannot be disregarded if the only evidence contradicting it rests upon the identification of the accused as the man who committed the crime. (*People v. Gardner* (1966), 35 Ill. 2d 564, 571, 221 N.E.2d 232.) Only when the evidence is so improbable as to raise a reasonable doubt of guilt (*People v. Tuell* (1981), 97 Ill. App. 3d 849, 423 N.E.2d 954) or where a conviction "rests upon identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt" will it be reversed (*People v. Gardner* (1966), 35 Ill. 2d 564, 571, 221 N.E.2d 232, 236, quoting *People v. McGee* (1961), 21 Ill. 2d 440, 444, 173 N.E.2d 434, 436).

Within the framework of those general principles, we find significant

the testimony of Rubin Mercado that on the night in question the store was well lighted as he viewed the shooting from a distance of about 1½ feet. He also stated that he had a clear view of defendant and saw his entire face for about one minute, especially recalling defendant's Afro hairstyle and beard, and that defendant was in the store for 5 or 10 minutes. Furthermore, Rubin selected defendant from a lineup approximately one month after the incident and identified him in court, pointing out that at trial defendant was heavier and his beard fuller than they had been on the night in question.

■■ Defendant points to a discrepancy between Rubin's purported description of defendant to the police and what the police actually reported. Rubin testified to telling the police that defendant had an Afro and a beard; but the police report, admitted by stipulation, contained the notation that Rubin could describe the assailants as being Latin and the man with the gun as having an Afro and being between 20 and 25 years old. In our view, however, the report simply omitted a detail from Rubin's description and is not inconsistent. Moreover, it is well established that a police report which an identifying officer neither prepared nor signed does not constitute grounds for impeachment. (*People v. Spain* (1980), 91 Ill. App. 3d 900, 415 N.E.2d 456; *People v. Currie* (1980), 84 Ill. App. 3d 1056, 405 N.E.2d 1142.) Similarly, it can scarcely be said that Rubin should be held accountable for the contents of the police report, since he was 11 years old at the time in question and at trial denied telling the police officer that he could only describe the offenders as stated in the report. Rubin also testified that defendant wore a beard on the night in question; that he selected defendant in the lineup when he was wearing a goatee; and that defendant was 5 feet 10 inches and tall for a Latin. Officer David Wagner, the arresting officer, also testified that defendant was 5 feet 9 or 5 feet 10 and thinner than he was at trial.

Defendant also points out that Rubin could not recall anything about defendant's clothing or which hand the gun was in, and he could not describe the other man. The law is clear, however, that precise accuracy in describing the accused is unnecessary if the identification is otherwise positive, since minor discrepancies affect only the weight given to testimony but not the credibility of the witness. (*People v. Hine* (1980), 88 Ill. App. 3d 671, 410 N.E.2d 1017.) Additionally, we note that the facts surrounding the identification here compare favorably to other cases in which the identification was held sufficient to convict. (See, *e.g., People v. Brown* (1959), 16 Ill. 2d 482, 158 N.E.2d 579 (unmasked assailants in well-lighted location, victim's detailed description followed two weeks later by photo identification and two months later by lineup identification); *People v. Baker* (1979), 78 Ill. App. 3d 411, 396 N.E.2d 1174 (in well-lighted street, witness faced defendant for 1½ to 2 minutes from 3 to 4

feet away and the next day identified him from photographs and lineup); *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847 (one-minute observation in well-lighted store from one foot away while accused pointed gun at witness); *People v. Stepney* (1977), 46 Ill. App. 3d 328, 360 N.E.2d 1206 (with shotgun pointed at him, witness observed accused under good lighting for 30 to 40 seconds from one foot away).) Finally, it is clear from the record that, along with all the other facts and circumstances of the case, the trial court fully considered the alibi testimony of defendant and the two witnesses on his behalf and found that testimony to be unworthy of belief.

■■ We conclude that the evidence of defendant's guilt did not rest upon an identification which was so doubtful, vague, and uncertain as to fail to produce an abiding conviction of guilt. The judgment does not, therefore, warrant reversal.

Defendant next contends that the State's failure to inform defense counsel of an alibi defense rebuttal witness unfairly influenced his decision to present an alibi defense. He argues in essence that defense counsel complied with its obligation to disclose information to the State regarding his defense of alibi in accordance with Supreme Court Rule 413(d)(iii) (73 Ill. 2d R. 413(d)(iii)); consequently, defendant claims he was entitled to reciprocal compliance by the State with regard to disclosure of rebuttal witnesses under Supreme Court Rule 412(a) (73 Ill. 2d R. 412(a)). We note that the requirement of reciprocal discovery is mandated by *Wardius v. Oregon* (1973), 412 U.S. 470, 37 L. Ed. 2d 82, 93 S. Ct. 2208.

In this regard, the record indicates that shortly after trial began, defense counsel Fox gave the State two pages of handwritten notes, which he believed were made by former defense counsel Adam concerning interviews with Ivette Rodriguez and Sonia Gonzalez, whose names appeared on the notes. The two sheets were unsigned and undated, and defense counsel did not know when, where, or how the information therein was taken, but he characterized this submission as defendant's "answer." It further appears that Ivette subsequently testified contrary to the information contained in the notes. In particular, she testified on direct examination to picking up defendant at 7:30 p.m. on the night in question, but on cross-examination she admitted to telling attorney Adam that she picked up defendant at 9 p.m., and she further denied on cross-examination telling Officer Musial that she picked up defendant at 9 p.m. On redirect examination, Ivette testified that she told attorney Adam she first saw defendant "after 8 o'clock and it was somewhere between 8:00 and 9:00" and that during her conversation with Adam she changed the time to "9:30 that night, or ten." In rebuttal, Musial testified that Ivette told him she picked up defendant at 9 p.m. Defendant thus maintains that

the State's failure to reveal Musial's testimony beforehand crucially affected the decision to present the alibi defense.

■■ We need not address the various points made by the parties in support of their positions, for it is manifest that the State's nondisclosure of Officer Musial's rebuttal testimony did not cause defendant unfair prejudice. Expanding upon defendant's argument, had Musial's proposed testimony been revealed to defendant before trial and had defendant as a consequence decided not to present the alibi defense, the testimony of Rubin Mercado, already found to be sufficiently strong to convict, would have been further strengthened by standing uncontradicted. Additionally, defendant does not assert that if he had known Musial would testify, Ivette's testimony would not have been self-contradictory, for to say that Ivette would have testified differently would, in light of the record, be tantamount to asserting either that her testimony would not have been helpful to defendant or that it would have been false. In other words, the harm to defendant stems not from Musial's testimony but from the contradictions in Ivette's, and the trial court so found. Furthermore, we note that where the State fails to comply with a discovery request, it is nevertheless within the sound discretion of the trial court to admit testimony of unlisted witnesses, and the admission of such evidence does not constitute error absent a showing of prejudice and surprise. (*People v. Mason* (1978), 61 Ill. App. 3d 918, 378 N.E.2d 384; also see *People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126.) We conclude, therefore, that even if the State failed to disclose the substance of Musial's testimony, there was no serious prejudice to defendant.

Finally, defendant contends that he was denied a fair trial by the trial court's failure to grant immunity to a defense witness who purportedly told defendant and defense counsel that another man named Linguna, who was apparently deceased at the time of trial, had admitted to the witness that he (Linguna) and not defendant had shot Darang. We find no merit to this contention as presented.

■■ There is no general sixth amendment right of defendants to demand that witnesses of their choice be granted immunity or that indictments against them be dismissed. (*United States v. Herman* (3d Cir. 1978), 589 F.2d 1191, *cert. denied* (1979), 441 U.S. 913, 60 L. Ed. 2d 386, 99 S. Ct. 2014; *United States v. Wright* (2d Cir. 1978), 588 F.2d 31, *cert. denied* (1979), 440 U.S. 917, 59 L. Ed. 2d 467, 99 S. Ct. 1236; *United States v. Ramsey* (7th Cir. 1974), 503 F.2d 524, *cert. denied* (1975), 420 U.S. 932, 43 L. Ed. 2d 405, 95 S. Ct. 1136; also see *In re Kilgo* (4th Cir. 1973), 484 F.2d 1215, 1222.) Furthermore, it is the law in this State that courts have no inherent power to immunize witnesses in order to secure testimony which the defense deems relevant. *People v. Bracey* (1981), 93 Ill. App. 3d 864,

417 N.E.2d 1029; *People v. Frascella* (1980), 81 Ill. App. 3d 794, 401 N.E.2d 1045.

Defendant's reliance on *Government of the Virgin Islands v. Smith* (3d Cir. 1980), 615 F.2d 964, is misplaced. In that case, the court discussed two due process grounds upon which the immunized testimony of a defense witness may rest. The court stated in that regard:

> "When the court finds prosecutorial misconduct by the government's deliberate intent to disrupt the factfinding process, it should order the government to grant statutory immunity to the defense witness or face a judgment of acquittal. In addition, even if there is no evidence of such prosecutorial misconduct, when it is found that a potential defense witness can offer testimony which is clearly exculpatory and essential to the defense case and when the government has no strong interest in withholding use immunity, the court should grant judicial immunity to the witness in order to vindicate the defendant's constitutional right to a fair trial." (615 F.2d 964, 974; accord *United States v. Herman* (3d Cir. 1978), 589 F.2d 1191, *cert. denied* (1979), 441 U.S. 913, 60 L. Ed. 2d 386, 99 S. Ct. 2014.)

In *Smith*, three defendants contended that their due process rights were violated by the failure to grant immunity to one Sanchez who had made a statement to the police which implicitly exculpated those defendants. At the time of the offense in question, Sanchez was less than 16 years old and was within the exclusive jurisdiction of the juvenile authorities, who offered to grant him use immunity on the condition, and for reasons of prosecutorial courtesy, that the United States Attorney consent. For no apparent reason, such consent was not granted, and the potentially exculpatory testimony was not presented to the jury.

The Third Circuit held, first of all, that the government's refusal to consent revealed a "deliberate intention of distorting the judicial factfinding process" which warranted the defendants in insisting that statutory immunity be granted their witness. In so holding, the court noted that such decision was part of the government's strategy in prosecuting an "inherently weak" case; that the "refusal also furnished the predicate for the government's objection to admitting Sanchez' statement given to the police"; and that the United States Attorney had no jurisdiction to prosecute Sanchez. 615 F.2d 964, 969.

The *Smith* court also rested its decision upon its inherent power to grant judicial immunity, which may be granted if "the defendant is prevented from presenting exculpatory evidence which is crucial to his case" (615 F.2d 964, 969), and the court formulated the test for granting judicial immunity as follows:

"[B]efore a court can grant immunity to a defense witness, it must be clear that an application has been made to the district court naming the proposed witness and specifying the particulars of the witness' testimony. In addition, the witness must be available and the defendant must make a convincing showing sufficient to satisfy the court that the testimony which will be forthcoming is both clearly exculpatory and essential to the defendant's case. Immunity will be denied if the proffered testimony is found to be ambiguous, not clearly exculpatory, cumulative or if it is found to relate only to the credibility of the government's witnesses. Once the court determines that the defendant has satisfied this threshold burden, the focus then shifts to consideration of the state's countervailing interests, if any." 615 F.2d 964, 972-73.

The record fails to disclose that the defense witness in the present case made a statement to the police, as did the witness in *Smith*. Thus, the State would be afforded no opportunity to verify the testimony to the same extent as was possible in *Smith*. Secondly, there is no indication here that the witness was under the exclusive jurisdiction of other authorities, so that the suggestion of deliberate distortion of the fact-finding process is unsupportable. Finally, since the evidence against defendant here was strong, it seems clear that the State's resistance to the granting of immunity was wholly unrelated to a strategy to prosecute an "inherently weak" case. Thus, while the granting of Federal statutory immunity is not at issue here, the facts before us do not warrant defendant's reliance on *Smith*.

■■ Further, it is apparent in the present case that defendant's argument as to what his witness would say if called to testify is speculative. Whether the witness would maintain the position which defense counsel asserted in its offer of proof, absent some form of independent verification such as a statement to the police, is a matter of conjecture and cannot, in our view, be the basis for a finding that defendant was denied a fair trial. (See *United States v. Wright* (2d Cir. 1978), 588 F.2d 31, *cert. denied* (1979), 440 U.S. 917, 59 L. Ed. 2d 467, 99 S. Ct. 1236; *United States v. Carman* (9th Cir. 1978), 577 F.2d 556.) Therefore, consideration of the State's countervailing interests in this case would not justify the requested grant of immunity.

It is also noteworthy that the Third Circuit's decision is not binding upon the courts of this State absent a pronouncement to that effect by the United States Supreme Court (*People v. Stansberry* (1971), 47 Ill. 2d 541, 268 N.E.2d 431, *cert. denied* (1971), 404 U.S. 873, 30 L. Ed. 2d 116, 93 S. Ct. 121), and that there is a conflict among the Federal circuits on this point (see, *e.g., United States v. Wright* (2d Cir. 1978), 588 F.2d 31, *cert. denied* (1979), 440 U.S. 917, 59 L. Ed. 2d 467, 99 S. Ct. 1236; *United States*

*v. Smith* (7th Cir. 1976), 542 F.2d 711; *United States v. Ramsey* (7th Cir. 1974), 503 F.2d 524, *cert. denied* (1975), 420 U.S. 932, 43 L. Ed. 2d 405, 95 S. Ct. 1136).

For the reasons stated, the convictions and the sentence are affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.