THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD L. HAMM, Defendant-Appellant.

Second District   No. 2—84—644

Opinion filed August 30, 1985.

12

G. Joseph Weller and Mary Kay Schick, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Judith M. Pietrucha, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Ronald L. Hamm, was charged by indictment in Kane County with armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—2), was convicted by a jury of the lesser included offense of robbery (Ill. Rev. Stat. 1983, ch. 38, par. 18—1), and sentenced to eight years in the Department of Corrections.

He contends here he is entitled to a new trial because he was denied due process of law when the State refused to produce, and the trial court to compel, the attendance of a key defense witness, and when the court refused to grant use immunity to that witness under the circumstances of the case.

The indictment against the defendant stemmed from the early morning robbery of Alfredo Patino on December 26, 1983. Patino went to the Elgin police department and, with the assistance of an interpreter, reported to Officers Turner and Sexton that he had been robbed at gunpoint. Turner then radioed for the assistance of Officer James Kelly, who was on patrol at the time. The officers followed

Patino to 376 North Street where the alleged robbery occurred. Officer Kelly was familiar with the house; he knew that it belonged to Sharon Ross, and that Sharon had been working as a prostitute for the past two years. Kelly also knew that the defendant, Ronald Hamm, was living at the house.

Patino and the officers parked their cars around the corner from the house, and Kelly radioed Officer Piske, the watch commander, to come to the scene. When Officer Piske arrived at the scene, he notified the police station that he would possibly need a search warrant and also requested the police detectives to be advised of the situation. Before the officers received any response, they observed Sharon's car and decided to stop it to see whether she was driving it. They followed the car to Sharon's driveway, and Officer Kelly parked directly behind it. Two women, Sharon Ross and Vicki Patton, exited the car and, when Kelly ordered them to stop, ran into the house. Piske and Kelly followed them into the house. They observed two children sleeping near the door, and another young girl was observed sleeping in one of the bedrooms.

Kelly stayed in the living room with the women, and Piske went into the basement where he observed the defendant, a black male, on a bed. The man was moving slightly, and the officer could see the man's left hand go down to the side of the bed. Piske had been informed that the victim reported he was at the house to have sex with a prostitute when a black male pointed a gun to his head and took $600 from his wallet. Piske approached the black male, patted him down, and seized $210 (one $100 bill, one $50, and three $20's) from underneath the mattress.

Prior to trial, defendant's motion to suppress the evidence and quash the arrest was denied. Defendant also filed a motion requiring the State to procure the attendance of Sharon Ross prior to and during the trial, and subsequently for Sharon Ross to be granted immunity. These motions were denied without an evidentiary hearing.

At trial, Patino testified he had spent Christmas evening with two friends, Miguel Quintana and a man named Contreras. At approximately 2 a.m., the men drove to the house on North Street because Patino knew it was a house of prostitution. He went into the house and left his friends outside in the car. He was carrying his wallet which contained $600 in cash (one $100 bill, four $50's, the rest $20's) and two paychecks. He testified he works in Cary and receives a paycheck for approximately $370 every two weeks. Patino gave the woman $20 and followed her into a bedroom. Almost immediately, a man entered the room, put a gun to Patino's head, and the woman

took his wallet. The man then took Patino into the hallway and the woman returned the wallet, minus the cash. Patino identified the defendant as the man who helped the woman rob him. When making the report at the police station, he identified a photo of Sharon Ross as the woman who took his wallet. Miguel Quintana testified that he waited in the car while Patino was in the house. Patino was gone for approximately 15 minutes, during which time no other people came out of the house. Officer Kelly testified that he followed Sharon Ross and Vicki Patton into the house. Officer Piske brought the defendant upstairs a few minutes later, and all three were placed under arrest. Sharon Ross was not charged with the offense.

Patino was subsequently brought to the police station, where he was interviewed by Officer Mark Brictson. Brictson then prepared a search warrant for the house. The warrant was executed, and Brictson testified that he seized two plastic toy cap guns from under the cushion of a living room chair. The guns were not capable of firing anything other than caps. He also testified a letter from the Department of Public Aid and a registration card from the Illinois Department of Public Health, both bearing the defendant's name, were seized from a bedroom dresser drawer.

Ronald Hamm testified on his own behalf. He stated that Sharon Ross had been his fiancee in 1977 or 1978. He testified he pled guilty to a charge of armed robbery in 1981, and served 2½ to three years in the Department of Corrections. He testified that upon his release on December 2, 1983, he lived with his aunt in Elgin.

The afternoon before the early morning incident, he had been at Sharon's house for Christmas dinner. After dinner, he left briefly to meet some friends for drinks, but returned to Sharon's because she was supposed to drive him to a new job the following morning. Sharon, Vicki Patton, and two friends named Steve and Colleen were at Sharon's house when he returned. In subsequent conversation, he learned that Sharon and Vicki were prostitutes. As Vicki, Steve and Colleen were leaving, a Mexican male arrived at the house. The defendant was tired, so he asked Sharon to wake him up about 6 o'clock the next morning, and he went downstairs to sleep. About two hours later, he was shaken awake by a police officer, taken upstairs, arrested and taken to the police station.

The jury found the defendant not guilty of armed robbery, but guilty of robbery on June 6, 1984. Defendant's post-trial motion was denied after argument on the motion was waived. Filed at the hearing on July 6, as a supplement to the defendant's post-trial motion, was defense counsel's affidavit setting forth the substance of the conversa-

tion he had with Sharon Ross prior to being retained to represent Ronald Hamm, in which she admitted taking $80 from the complainant's wallet which she stole from his car. Without objection, the State was given leave to file after sentencing an affidavit stating that at the time of defendant's trial, the State did not know where Sharon Ross was. The prosecutor then informed the trial court that "[I]t has now come to my attention now she is—she is available now." On July 9, the prosecutor filed his affidavit noted above, averring in substance that on June 6, 1984, he spoke with Elgin police captain J. W. Smith, who informed him that he had no results trying to find Sharon Ross in Elgin, and that he had obtained other information that she was somewhere in the Milwaukee area.

### PRODUCTION OF WITNESS

■■ Defendant contends he was denied his fifth amendment right of due process when the State failed to reveal the whereabouts of Sharon Ross or to produce her at trial. He equates the State's actions in this regard as suppression of evidence favorable to a defendant and, thus, in violation of his right of due process as set forth in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. As construed in *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562, due process has been denied under the *Brady* rule when (1) the defendant requests evidence and the prosecution suppresses it; (2) the evidence is favorable to the defendant; and (3) the evidence is material. Defendant argues that because all three circumstances were present in the case at bar, the violation of his due process right is thereby established requiring reversal and remandment for a new trial.

The State contends the defendant has misconstrued the facts in his attempt to prove it acted improperly. Further, the State asserts the defendant's reliance on *Brady* is misplaced, since that case deals with the prosecutions suppression of physical or documentary evidence. It points out there was no allegation that Sharon Ross had given the police a statement which was then suppressed nor, in fact, was there any indication that she could provide exculpatory evidence of any kind until June 4, the day of trial when the defendant made an offer of proof.

The first time the record shows discussion of defendant's April 6 motion for an order requiring the State to produce Sharon Ross, was on May 25, 1984. The defendant contended there that the State knew the whereabouts of Ross since she was a paid police informant for either the Elgin police department or "some other law enforcement

agency" in a drug case, People v. Kevin Spates and Toppie L. Spates, Kane County Circuit Court Nos. 84 CF 235, 226 and 236, and that the prosecutor in that case had represented to the court that Sharon Ross "would be produced" for that trial. Defendant's counsel here also represented the defendants in those cases. Defense counsel argued that when Sharon was paid some money by the Elgin police department, the police knew she would use it to leave the jurisdiction. The State pointed out to the court that Sharon Ross had been arrested as a participant in the robbery, that she did not fall within the status of a confidential informer, and that he did not know of her whereabouts. Defense counsel explained to the court:

"[T]he gist of my motion is *** if the State is hiding Sharon [Ross] or paid her to leave the jurisdiction, whether it's in this case or another case, and she is a material witness in this because she was present, according to the victim she was present when it happened and actually assisted it, and if they have got her hidden away somewhere because of another case I think it's incumbent on them to produce her.

The Supreme Court rules are if they have any evidence under their control that would negate the guilt of the Defendant, produce it."

The matter was continued to give the State an opportunity to review the status of Sharon Ross, and to report back, so that it could then be determined by the court whether to set the matter for hearing or to enter an order.

On June 1, the State reiterated its argument that Sharon Ross was not a confidential informant with regard to the case at bar, and that it had no control over her. The prosecutor stated he personally "talked to J. W. Smith [an Elgin police officer] who told me that she was in fact paid some money for some information she gave on other cases completely unrelated to this case, and that he had no idea where she was. He told her she was not to leave the jurisdiction, she would be needed in court, then he never saw—then, he never saw her again. He has no idea what her address is at this point." The prosecutor further stated, "I have no address for her. I don't know where she is at this point in time."

Defense counsel argued that the State had promised to produce Sharon Ross in the Spates' drug cases and that "the Elgin police department knows where she is otherwise why would Mr. Wechter [assistant State's Attorney, Spates' cases] be saying he is going to produce her?" Counsel argued further:

"She was present when this incident is alleged to have oc-

curred, or at least according to the victim she was present when this incident is alleged to have occurred, and it's the State's obligation to produce her."

Counsel reasoned:

"[I]f they have to produce her in the other cases they might as well produce her in this case because she is going to have to be present in this *** courthouse at some point soon because the other cases are moving along."

The court ruled that it would not order the State to produce Sharon Ross since, based on the assistant State's Attorney's representations to the court, neither the State nor the Elgin police department knew Sharon's whereabouts, and either the defendant or his friends had as good or even a better opportunity of knowing or learning where Sharon was. Defense counsel's request to be allowed to cross-examine J. W. Smith was denied, and he stated he was going to attempt to locate Sharon.

On June 4, the day of trial, counsel filed an unverified motion to grant Sharon Ross immunity. He reported that he had been able to determine that she was living at 2365 North Fifth Street, Apartment 2, in Milwaukee, Wisconsin. He talked with her by phone the night before, and reported that she refused to come to trial because she was afraid her testimony would incriminate her. Counsel for the first time then revealed that:

"[A]s an officer of the Court, I will state for the record that upon being retained by Ronnie Hamm, I had a conversation with Sharon [Ross] regarding the facts and circumstances of this case. At that time, Sharon advised me that the victim, Mr. Patino, came in to have sex with her. That his friend waited— waited out in the car. And after she had sex with Mr. Patino, she went out to the car to bring him in to have sex with him, as she was working as a prostitute. And at the time she went out to the car to get the victim's friend, she saw Mr. Patino's wallet lying on the seat of the car and she took it. And that there was $80 in it. She further told me there was no armed robbery involved or that no armed robbery occurred on that particular night. And that's what her testimony would be if she would testify."

The court was of course not bound to give credence to this unsworn representation of counsel.

Counsel also moved that the court issue a certificate pursuant to section 3 of the Uniform Act to Secure the Attendance of Witnesses From Within or Without a State in Criminal Proceedings (the Uni-

form Act) (Ill. Rev. Stat. 1983, ch. 38, par. 156—3), although he stated that Sharon Ross advised him that she would take the fifth amendment if summoned thusly. The court granted this motion and signed the certificate. Although the Uniform Act provided for it, the certificate did not "include a recommendation that the witness be taken into immediate custody and delivered to an officer of [Illinois] to assure [her] attendance in [Illinois]." (Ill. Rev. Stat. 1983, ch. 38, par. 156—3.) The act also provides that witnesses summoned thereunder into this State are exempt from arrest and service of process in connection with matters which arose before the witness' entrance into the summoning State. Ill. Rev. Stat. 1983, ch. 38, par. 156—4.

Defense counsel informed the court that the immunity sought was use immunity rather than transactional immunity. *Inter alia*, the prosecutor argued that in his experience, immunity is not granted until the witness testifying has indicated he or she does not wish to answer questions. The prosecutor also objected to issuance of the certificate to secure Sharon Ross' attendance at trial on the basis of timeliness, since the robbery occurred in late December 1983, and this was the first attempt counsel had made "to garner her ready for trial on the basis of the subpoena."

The court reserved its ruling on the motion for immunity since the prosecutor only just received the motion and had not had time to review the applicable law. The court signed the certificate with the proviso that it would not be used as a tactic to delay trial, and that counsel would be responsible for following through with it.

After jury selection, the prosecutor argued that under section 106—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 106—1) and as discussed in *People v. Gomez* (1982), 107 Ill. App. 3d 378, only the State may request immunity for a witness, and it was not so requesting immunity for Sharon Ross. In the absence of an offer from the defendant of any law or cases to the contrary, the court denied the motion for immunity. Defendant then stated: "Based on the court's ruling, then, I will not have her brought in."

Defendant argues the first requirement under *Brady* in determining whether due process has been denied was met here in that he made a specific request for the State to produce Sharon Ross and the State suppressed her whereabouts. Defendant's assertion that the State suppressed her whereabouts is based on his conclusion that the State must have known where she was since it had been ordered to produce her in the Spates' cases and Assistant State's Attorney Wechter had promised "to produce her." Defendant stated he under-

stood that although prosecuting attorney Barsanti might not have had personal knowledge of her whereabouts, "the Elgin Police Department knows where she is otherwise why would Mr. Wechter be saying he is going to produce her?"

Defendant asserts that by virtue of Supreme Court Rule 412(f) (87 Ill. 2d R. 412(f)), the investigative knowledge of one branch, person, or department of the government should be imputed to others and the burden is on the government to secure a free flow of information. In support, he cites generally to *People v. Rose* (1978), 65 Ill. App. 3d 264, in which the cause was reversed and remanded for a hearing to determine whether or not statements made to the FBI by two key accomplice witnesses were in existence and available to the prosecution because the statements were potentially useful to the defendant for impeachment purposes.

Supreme Court Rule 412(f) provides:

"(f) The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged."

Based on our review of the record, we do not believe the State's promise to produce Sharon Ross in the unrelated drug cases can be viewed as evidence the State knew where she was. The promise to produce evidences the State's willingness to comply with the discovery order entered in the Spates' cases, but does not allow the inference it had the present ability to either locate or produce her.

In *People v. Contursi* (1979), 73 Ill. App. 3d 458, the State appealed the dismissal of indictments against two defendants. The trial court dismissed the indictments after finding that the State's failure to produce the informant involved in the case was a violation of the defendant's sixth and fourteenth amendment rights (73 Ill. App. 3d 458, 459-60), where the defendants alleged the informant was present during, and had been the instigator, negotiator, and implementor of, the drug sale for which they were indicted. Although the State there did not challenge its obligation to disclose the identity of the informant, it contended it was not additionally required to physically produce the informant in court for examination by the defendants before trial. The appellate court agreed, after considering that the State was willing to supply the name and last known address of the informant, and that the informant's whereabouts were not known to the State and were not within the State's control. The court noted that the rules of discovery do not require that the State prepare the defend-

ant's case, and that "[f]undamental fairness does not require that the State maintain physical control over an informant's whereabouts until the time of trial." (73 Ill. App. 3d 458, 461.) Accordingly, the court reversed the dismissals and remanded the cause for further proceedings.

At the time the court here refused to order the State to produce Sharon Ross, her only known connection with the case was that she was "present" during the alleged armed robbery. She was neither an informant nor a codefendant with regard to the defendant's case; thus, she was apparently only an "occurrence witness." She was not listed on either the State's or the defendant's list of witnesses in answer to each other's discovery motion. It has been held that the supreme court rules do not require that the names of occurrence witnesses be made known to a defendant; rather, the rules grant the right to defendant only to " 'the names and last known addresses of persons whom the State intends to call as witnesses.' " (*People v. Longstreet* (1974), 23 Ill. App. 3d 874, 882-83; 87 Ill. 2d R. 412(a)(i).) Discovery of occurrence witnesses may be ordered pursuant to Supreme Court Rules, however, in the discretion of the trial judge if the information is available. *People v. Williams* (1974), 24 Ill. App. 3d 666, 670; see 87 Ill. 2d R. 412(h).

It does not appear here that any information as to Sharon Ross' whereabouts was available. As we have noted, we do not equate the State's indication that it would comply with the order to produce Sharon Ross in the Spates' cases with a present ability to locate her. The prosecutor personally tried to locate here, he was advised she had been paid for information she provided on other cases completely unrelated to the instant cause, and she was told she would be needed in court and that she should not leave the jurisdiction. She was not seen after that time, however, and the Elgin police department had no idea where she was. Consequently, it may not be said that there was a "flow of information" problem. The State cannot be accused of withholding evidence which is not in its possession, and cannot supply that which it does not have. (*People v. Visgar* (1983), 120 Ill. App. 3d 584, 589-90; *People v. Winfield* (1983), 113 Ill. App. 3d 818, 836-37.) Even though defendant argues the State encouraged or acquiesced in Sharon's unavailability because it paid her $1,200 for information on other cases, it is clear she was not in custody, and the State had no lawful means of limiting her privilege to travel. See *People v. Stumpe* (1979), 80 Ill. App. 3d 158, 162-63.

Considering the personal relationship between the defendant and Sharon Ross, we believe the trial court was correct in its judgment

that the defendant or his friends had as good or even a better chance of locating her than the State. As shown by the record, defense counsel in fact was able to secure Sharon Ross' address and phone number before trial, and the first indication in the record that the State had access to knowledge of her whereabouts appears in an excerpt from the report of proceedings of the discovery hearing in the Spates' cases the day *after* the defendant's trial concluded. Accordingly, we conclude that no suppression in violation of *Brady* can be said to have occurred. *People v. Palmer* (1982), 111 Ill. App. 3d 800, 804.

In view of this conclusion, a vital element of defendant's proof that a due process violation occurred has not been met. It is therefore unnecessary to decide whether the evidence Sharon Ross purportedly would have given at trial would have been favorable to the defendant and material either to his guilt or punishment.

In *People v. Lewis* (1984), 105 Ill. 2d 226, 235, citing *People v. Williams* (1980), 91 Ill. App. 3d 631, 634, it was noted that:

" 'Materiality in a constitutional sense is not the mere possibility that the undisclosed information might have helped the defense or affected the outcome of the trial. Rather, the omitted evidence is material if, when evaluated in the context of the entire record, it creates a reasonable doubt of the defendant's guilt. *United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392; *People v. Abendroth* (1977), 52 Ill. App. 3d 359, 367 N.E.2d 571.' "

Based on our review of the record, it does not appear that Ross' testimony would have been corroborated by any other evidence presented at trial. In fact, it apparently would have been contradicted by the testimony of the victim that he had his wallet with him when he entered the house, and by the testimony of the victim's companion, Miguel Quintana, who testified that no one came out of the house while he was waiting in the car with Contreras.

### IMMUNITY

Defendant argues the court's refusal to grant use immunity to Sharon Ross violated his sixth amendment right to compel witnesses on his behalf. He contends that the Illinois immunity statute (Ill. Rev. Stat. 1983, ch. 38, par. 106—1), which authorizes "transactional" immunity for a witness on motion of the State, is not applicable where the immunity sought is "use" immunity for a defense witness. In such cases, defendant argues, the trial court may grant use immunity if there has been a clear deprivation of due process.

In support, he cites *People v. Lee* (1980), 88 Ill. App. 3d 396, and

points to the State's "eleventh hour" delivery of information as to Sharon Ross' whereabouts, and its failure to "preserve" her as a witness as clear violations of due process. He further argues the State "took meaningful steps" in coercing her to remain silent since, in return for its nonprosecution of her in the instant cause, she agreed to be a State witness in the Spates' cases.

In response, the State rejects the defendant's interpretation of *People v. Lee*, labeling it a "totally erroneous one," and points out that there is no general sixth amendment right of defendants to demand that witnesses on their behalf be granted immunity or that indictments against them be dismissed. *United States v. Ramsey* (7th Cir. 1974), 503 F.2d 524.

The Illinois immunity statute provides:

> "In any investigation before a Grand Jury, or trial in any court, the court on motion of the State may order that any material witness be released from all liability to be prosecuted or punished on account of any testimony or other evidence he may be required to produce." Ill. Rev. Stat. 1983, ch. 38, par. 106—1.

The effect of this grant of immunity is stated in the next section:

> "Such order of immunity shall forever be a bar to prosecution against the witness for any offense shown in whole or in part by such testimony or other evidence except for perjury committed in the giving of such testimony." Ill. Rev. Stat. 1983, ch. 3, par. 106—2.

It has been described as providing "full transactional immunity" in *People ex rel. Cruz v. Fitzgerald* (1977), 66 Ill. 2d 546, 549, and in *In re Cook County Grand Jury* (1983), 113 Ill. App. 3d 639, 643. The difference between transactional immunity and use and derivative use immunity is described in *Cruz*:

> "Under use immunity, a witness' compelled testimony or leads derived therefrom [derivative use] may not be used in his prosecution. Under transactional immunity, however, the witness is fully immunized from prosecution for any offenses to which his compelled testimony may relate. See *Kastigar v. United States* (1972), 406 U.S. 441, 32 L. Ed. 2d 212, 92 S. Ct. 1653." *People ex rel. Cruz v. Fitzgerald* (1977), 66 Ill. 2d 546, 549; see also *People v. Lee* (1980), 88 Ill. App. 3d 396, 397 n.1.

*Kastigar* held that immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination and is therefore sufficient to compel testimony over a claim of the privilege. As that court noted also, although a grant of immunity must af-

ford protection commensurate with that afforded by the fifth amendment privilege against self-incrimination, it need not be broader. (*Kastigar v. United States* (1972), 406 U.S. 441, 453, 32 L. Ed. 2d 212, 222, 92 S. Ct. 1653, 1661.) "Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege." 406 U.S. 441, 453, 32 L. Ed. 2d 212, 222, 92 S. Ct. 1653, 1661.

A grant of immunity under statutory authority must be in strict compliance with the terms of the statute (*People v. Rockola* (1930), 339 Ill. 474), since the removal of the privilege against self-incrimination by a grant of immunity is a matter which must be left to the legislature (*People v. English* (1964), 31 Ill. 2d 301, 308), and which may only be accomplished by the legislature. (*People ex rel. Kunce v. Hogan* (1976), 37 Ill. App. 3d 673, 678, *aff'd in part and rev'd in part on other grounds* (1977), 67 Ill. 2d 55, *cert. denied* (1978), 434 U.S. 1023, 54 L. Ed. 2d 771, 98 S. Ct. 750.) Quoting Justice Cardozo, the *Kunce* court noted:

> " 'The grant of an immunity is in very truth the assumption of a legislative power ***. It is the assumption of a power to annul as to individuals or classes the statutory law of crimes, to stem the course of justice, to absolve the grand jurors of the county from the performance of their duties, and the prosecuting officer from his.' *Doyle v. Hofstader*, 257 N.Y. 244, 261-62, 177 N.E. 489, 495 (1931)." *People ex rel. Kunce v. Hogan* (1976), 37 Ill. App. 3d 673, 679.

■ Although the right to call witnesses in one's behalf is essential to due process (*Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038), it has been uniformly held that a defendant cannot require the State's Attorney to grant immunity to a defense witness in order for the defendant to obtain relevant evidence (*People v. Gomez* (1982), 107 Ill. App. 3d 378, 384; *People v. Frascella* (1980), 81 Ill. App. 3d 794, 798), and has no constitutional sixth amendment right to compel the State to confer immunity upon a defense witness who has exercised his privilege against self-incrimination. *People v. Columbo* (1983), 118 Ill. App. 3d 882, 971-72; *People v. Bracey* (1981), 93 Ill. App. 3d 864, 872; *People v. Pantoja* (1976), 35 Ill. App. 3d 375, 381; *United States v. Ramsey* (7th Cir. 1974), 503 F.2d 524, 532-33.

We do not agree that *People v. Lee* (1980), 88 Ill. App. 3d 396, or *People v. Lawson* (1977), 67 Ill. 2d 449, provide authority for defendant's claim that a trial court may grant "use" immunity without stat-

utory authority if there has been a clear deprivation of due process. As the State points out, the court in *Lee* did not reach the issue because the circumstances of that case did not present such "a clear deprivation of due process of law." The *Lawson* court held that a trial court has inherent authority to dismiss an indictment in a criminal case where there has been a clear denial of due process.

In the *Lawson* case, the court considered whether preindictment delay was so prejudicial as to amount to denial of due process. The court determined that in order for the accused to shift the burden to the State to show the reasonableness of the delay, the accused had to come forward with a clear showing of actual and substantial prejudice. Because the three defendants in *Lawson* were able to demonstrate at most only the possibility of prejudice, the court found the burden did not shift, and no due process violation was found. 67 Ill. 2d 449, 455-60.

Defendant's assertion here that the State's "eleventh hour" disclosure on Saturday, June 2, of Sharon Ross' whereabouts was a clear deprivation of due process is without support. By our reading of the record, Ross' whereabouts were discovered by defense counsel himself, and that as of June 6, the State's only information was that Ross was "in the Milwaukee area." Further, the State's obligation to "preserve" physical evidence as discussed in *People v. Vargas* (1983), 116 Ill. App. 3d 787 (a tape recording), and *People v. McDowell* (1984), 121 Ill. App. 3d 491 (blood stains), both cases cited by defendant, cannot be equated with its alleged failure to "preserve" Sharon Ross as a witness. As noted previously in our discussion of *People v. Contursi* (1979), 73 Ill. App. 3d 458, Ross was not in custody, nor was she an informant with regard to the instant cause so as to require her production at trial as a material witness. Accordingly, the State had no obligation to maintain physical control over her, nor did it have any lawful means of limiting her privilege to travel. *People v. Stumpe* (1979), 80 Ill. App. 3d 158.

The showing of prejudice made by the defendant here is that the court's refusal to grant use immunity to Ross deprived him of his sixth amendment due process right to present this "key" witness in his defense. In a factually similar case, the court in *United States v. Wright* (2d Cir. 1978), 588 F.2d 31, found the defendant could not contend on appeal that the failure of the government to provide use immunity to a potential witness deprived him of his right to due process, because he failed to make a sufficient showing that he desired to have the potential witness testify and that the witness would refuse to testify without use immunity. The defendant's lawyer there had spoken

with the potential witness' attorney who asserted that the witness would not talk with defendant's lawyer, and that the witness would take the fifth amendment if defendant's attorney subpoenaed him. Upon being advised later that the witness would insist upon nothing less than "full-blown immunity," defendant's attorney told the court that "as a result, I am not wasting any money to subpoena [the witness]." 588 F.2d 31, 36.

The court found that because the defendant failed to subpoena the witness and to prove any need for use immunity, he could not demonstrate that the refusal to confer immunity prejudiced his trial. The court stated:

> "Whether [the witness] would have maintained the position that his attorney asserted, had he actually been subpoenaed and called to the stand, is a matter of speculation upon which this court cannot base a finding that Wright was denied his due process right to a fair trial." 588 F.2d 31, 37.

The speculative nature of defendant's like assertion in the case at bar is clear in that defendant never actually subpoenaed Ross, either at her last known address in Elgin, or at her later discovered address in Milwaukee. Whether she would have invoked her fifth amendment privilege if thusly subpoenaed or, in fact, whether she would testify as represented in defense counsel's offer of proof, are purely matters of conjecture which cannot be the basis for a finding that the defendant was denied a fair trial. See *People v. Gomez* (1982), 107 Ill. App. 3d 378, 386.

We conclude the court's denial of use immunity did not violate the defendant's sixth amendment right to compel witnesses.

The judgment of the circuit court of Kane County is affirmed.

Judgment affirmed.

NASH, P.J., and LINDBERG, J., concur.