THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WARREN PETERS, JR., Defendant-Appellant.

Second District   No. 2—84—1007

———

Opinion filed June 11, 1986.—Rehearing denied July 18, 1986.

Glenn Seiden and James A. Graham, both of Glenn Seiden & Associates, of Chicago, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Kenneth R. Boyle, of State's Attorneys Appellate Service Commission, of Springfield, and William L. Browers and Andrea Becker, both of State's Attorneys Appellate Service Commission, of Elgin, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

Defendant, Warren Peters, Jr., was charged by indictment with murder and aggravated kidnaping (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(3), 10—2(a)(3)). At a jury trial defendant was found guilty of both charges and sentenced to a term of imprisonment of 80 years for murder and a concurrent term of 60 years for aggravated kidnaping.

Defendant filed a post-trial motion which was denied. This appeal ensued.

In this court defendant contends that he was denied a fair trial due to: (1) the State's alleged discovery violation; (2) the State's failure to grant immunity to a prospective witness; and (3) the State's systematic exclusion of blacks as jurors. Additionally, defendant contends the evidence at the trial was neither sufficient to prove him guilty of murder beyond a reasonable doubt under an accountability theory nor sufficient to prove him guilty beyond a reasonable doubt of felony murder. Further, defendant argues newly discovered evidence warranted a new trial.

Because the record in the instant case is extensive we have attempted to relate, as briefly as possible, the trial testimony relevant to a resolution of the issues defendant has raised. Additional evidence will be discussed in conjunction with the issues when appropriate.

At trial the State's leading witness, Rene Valentine, testified that on February 4, 1984, at about 1 a.m. he and Michele Thompson were sitting in the front seat of his car in the parking lot of D. Laney's Tavern. Hector Reuben Sanchez approached the car, opened the driver's door, held a gun to Valentine's head, and tried to get into the car. At the same time a black male (later identified as the defendant, Warren Peters) opened the passenger door, grabbed Thompson, and pushed his way into the car.

When Thompson saw Sanchez' gun, she became hysterical, screaming for help and trying to escape. Valentine related that defendant was trying to hold Thompson and control her. The passenger door of the car opened and Thompson fell to the ground. Defendant picked her up, put both arms around her body, and carried her, as she struggled and screamed, to the defendant's car. Sanchez and the defendant pushed and pulled Thompson into the car. Sanchez then directed Valentine at gunpoint to an alley behind D. Laney's Tavern, where Sanchez shot Valentine twice. Valentine, however, managed to escape. Valentine related that during this entire occurrence, he never heard Sanchez give any order or directions to defendant.

Defendant's trial testimony regarding the events in the tavern parking lot differed substantially from Valentine's. In general, defendant's testimony was that he was unaware of Sanchez' plan to shoot or abduct anyone, that when defendant saw the gun he tried to calm Thompson, that Thompson was receptive to defendant's promises to protect her, and that defendant did not drag or carry her to his car but rather led her by the hand. Additionally, defendant stated that Sanchez threatened to kill the defendant if he did not keep Thompson in the car

while Sanchez took Valentine into the alley.

The defendant related that when Sanchez returned and reentered defendant's car, he handcuffed Thompson and ordered defendant to hold her while Sanchez drove her to his house. At the house, defendant watched Sanchez rape Thompson. According to defendant, he kept telling Sanchez that what he was doing was wrong, but Sanchez would not listen. It was defendant's testimony that he did not sexually assault Thompson and that he remained at the house both because he wanted to try to protect Thompson and because he could not escape from Sanchez.

Defendant related that Sanchez bound Thompson after raping her, and then defendant and Sanchez went outside to move their cars into the garage. When they returned to the house, Thompson was gone. According to defendant, Sanchez ran to find the girl, but defendant did not assist in the search. Sanchez returned to the house after dragging Thompson across a neighbor's yard. Sanchez then left the girl in the house with defendant while Sanchez returned to the neighbor's house to explain the disturbance.

The testimony of the neighbor, Gene Gonyo, indicated he had been awakened by someone pounding on his back door and by his dog's barking. As he looked outside, Gonyo saw Sanchez and a girl struggling. Gonyo was about to phone the police when his front doorbell rang. Gonyo opened the door, finding Sanchez, standing alone, outside. Sanchez apologized for the disturbance, explaining that the girl's behavior was due to alcohol or drugs. Gonyo testified that in the short time period between Gonyo's observance of Sanchez' struggle with the girl and Sanchez' subsequent appearance alone at Gonyo's front door, Sanchez could not have gone into his house and returned to Gonyo's.

Defendant testified that upon Sanchez' return from his explanation to the neighbor, Sanchez dragged Thompson down into the basement to kill her. According to defendant, Sanchez ordered him to follow. Defendant stated he closed his eyes while Sanchez killed Thompson. Afterwards, Sanchez ordered defendant to help him carry the girl's body upstairs and put it into the car. Sanchez and defendant then drove to Wisconsin where defendant tossed the body out of the car. According to defendant, Sanchez threatened to kill the defendant if he told anyone about the murder.

Defendant testified that a few days later he told Sam Siler, a friend, that he might need an alibi for the night Thompson was murdered. Siler's testimony revealed that defendant had specifically asked Siler to provide an alibi.

George Spinelli, an F.B.I. agent, related that when he spoke with

defendant on February 8, 1984, defendant stated that on the evening of the murder he was drinking with his friend, Sam Siler. According to Spinelli, defendant provided F.B.I. agents with a different statement on February 9, 1984. Most noticeable in that 26-page typewritten statement, which was read into evidence, was the lack of any claim by defendant that his conduct on the night of the murder resulted from orders, directions, or threats by Sanchez.

The jury found defendant guilty of murder and aggravated kidnaping.

■ In his first contention, defendant theorizes that the contents of the handwritten notes taken by an F.B.I. agent during an interview with Rene Valentine, the State's leading witness, were material and favorable to defendant's theory of defense and should have been made available prior to trial to aid defendant in the preparation of his defense. According to defendant, the State's failure to tender the F.B.I.'s handwritten notes, used in preparing the agency's typewritten 302 reports, denied him a fair trial under *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and, thus, the trial court erred in denying defendant's motion for a mistrial based on this discovery violation.

In *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, the Supreme Court held that a violation of due process occurs when a prosecutor, regardless of motive, suppresses evidence material to either the guilt or innocence of the accused after there has been a request for its production. To establish a *Brady* violation, the defendant must show that the evidence was suppressed following a request for it by the defendant, that the evidence was favorable to the defendant, and that the evidence was material. (*People v. Post* (1982), 109 Ill. App. 3d 482, 489, 440 N.E.2d 631.) It is not enough that the evidence might have helped the defense. (*People v. Kosik* (1982), 110 Ill. App. 3d 930, 940, 443 N.E.2d 238.) Rather, for the evidence to be material under *Brady* it must tend to raise a reasonable doubt of defendant's guilt (110 Ill. App. 3d 930, 940, 443 N.E.2d 238) or, at the very least, be reasonably expected to affect the outcome of the case (*People v. Velez* (1984), 123 Ill. App. 3d 210, 217, 462 N.E.2d 746). Such was not the situation in the instant case.

We first note that, although the record indicates the handwritten notes regarding Rene Valentine were tendered to defense counsel during trial, their receipt acknowledged by counsel, and the portion in question admitted into evidence, the notes do not appear in the record on appeal. As any doubt arising from an incomplete record will be resolved against an appellant (*People v. Benford* (1975), 31 Ill. App. 3d

892, 897, 335 N.E.2d 106), we could deny defendant any relief for the alleged discovery violation on this basis alone. Nevertheless, we choose to address defendant's argument pertaining to this violation.

It is indicated in the record that the statements at issue in the handwritten F.B.I. notes, "Keep girl in car" and "Don't try to run, or I'll shoot you," appeared on two separate lines within the handwritten statement. Although defense counsel claimed that both sentences were spoken by Sanchez to defendant and supported defendant's theory that he acted under threats from Sanchez, the notes apparently did not indicate to whom the statement, "Don't try to run, or I'll shoot you," was directed. Additionally, in testimony presented after receipt of the notes by defendant, Rene Valentine stated that he never heard Sanchez threaten defendant. Also, the typewritten F.B.I. report, prepared from the notes and tendered during discovery to defendant, did not relate any threats or orders by Sanchez to defendant. Testimony by F.B.I. Agent Gerald Buten, who took the notes, revealed that the statement in question was made by Sanchez to Valentine and that Valentine had never related that Sanchez had threatened defendant.

It is questionable whether the State's failure to tender handwritten notes constituted a discovery violation. At the arraignment of Sanchez and defendant on March 4, 1984, counsel for Sanchez particularly noted that the F.B.I. agents make handwritten notes upon which they base their typewritten 302 reports. Sanchez' counsel asked the court to order the State to preserve these notes. Counsel for defendant was present at this time and joined in the request. The record shows that the State complied with this request by informing the F.B.I., via a letter, not to destroy any of the notes.

Although defendant's counsel knew of the existence of these notes and that he had the right to demand that they be produced, counsel waited until the trial was in progress to complain that the notes had not been provided by the State during discovery. In this manner, the alleged discovery violation in the case at bar and the discovery violation in *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, differ noticeably. In *Brady* the existence of the suppressed evidence was unknown to the defense until after trial, conviction, sentence, and affirmance. Here, defense counsel knew of the existence of handwritten notes prior to trial and also had in his possession the typewritten copy of Valentine's statement based on Agent Buten's handwritten notes.

Despite the fact that the handwritten notes could arguably be considered as an item requested by defendant in his motion for discovery, the instant case fails to meet the additional requirements for a *Brady*

violation, *i.e.*, that the suppressed evidence be shown to be material and of a character favorable to defendant. Based on the record presented to this court, we conclude that even if defendant could have shown that the statement, "Don't run, or I'll shoot you," was made by Sanchez to defendant, the jury was still unlikely to believe from the rest of the evidence presented at trial defendant's theory that he was present at the kidnaping, rape, and murder of Thompson only because of threats against him by Sanchez.

Defendant's own testimony belied his claim that Sanchez' threats prevented him from fleeing from the scene of the crimes or from aiding the victim. That testimony revealed that on at least five different occasions during the course of the criminal enterprise, defendant was out of the presence of Sanchez: (1) in D. Laney's parking lot when Sanchez disappeared with Valentine and defendant was left alone with Thompson; (2) when defendant got into his car at Sanchez' home to move it out of the driveway and into the garage; (3) when Sanchez was allegedly chasing Thompson alone in the area surrounding Sanchez' home; (4) when defendant left the living room and went into the kitchen while Sanchez raped Thompson; and (5) when defendant went upstairs to the bathroom after Sanchez had killed Thompson in the basement.

Additionally, defendant's testimony revealed that a phone was available in the kitchen on which defendant could have summoned help, that several doors existed within Sanchez' home through which defendant could have fled, and that Sanchez was no longer wielding a gun when he, defendant, and Thompson were within the home. In light of the other evidence presented at trial, the handwritten notes were unlikely to strengthen defendant's defense theory that he remained at the scene of the crimes because of Sanchez' threats. Thus, any error on the State's part in not tendering the handwritten notes in question was harmless beyond a reasonable doubt, as it was unlikely the jury's verdict resulted from such error. *People v. Brown* (1982), 104 Ill. App. 3d 1110, 1121, 433 N.E.2d 1081.

■ Moreover, in determining that a discovery violation has occurred a trial court may impose any sanction which, in its discretion, it deems just under the circumstances. (87 Ill. 2d R. 415(g); *People v. Loggins* (1985), 134 Ill. App. 3d 684, 691, 480 N.E.2d 1293.) In the instant case, the court concluded that the notes should have been part of discovery but found that the State's failure to tender them to the defense prior to trial was not wilful. Additionally, in accordance with Supreme Court Rule 415(g) (87 Ill. 2d R. 415(g)) the court imposed an appropriate sanction; it ordered the State to provide the material not

previously disclosed. The State complied, providing the handwritten notes pertaining to Valentine and all other witnesses who were to testify. Further, the court ordered the State to make the agent who took the notes available to talk to defense counsel and to make Valentine equally available and subject to further cross-examination, if defense counsel so desired. Defense counsel did recall Valentine and cross-examined him regarding the statements in the notes. Thus, defendant was not prejudiced in getting these notes, as they were made available to him during trial for impeachment purposes. We also note that photocopies of the handwritten notes were introduced into evidence by defense counsel and given to the jury to consider during its deliberation.

■ The only sanction defendant requested for the State's alleged discovery violation was a mistrial; he neither sought a recess nor a continuance. Factors which should be considered in determining whether the State's failure to comply with discovery requires a retrial include "the strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, and the willfulness of the State in failing to disclose." (*People v. Norks* (1985), 137 Ill. App. 3d 1078, 1090, 484 N.E.2d 1261.) It is apparent from the record that these factors were absent and that defendant's requested sanction was disproportionate to the discovery violation. The sanction imposed by the trial court was a proper exercise of the court's discretion, as it eliminated any possible prejudice created by the discovery violation. (137 Ill. App. 3d 1078, 1090, 484 N.E.2d 1261.) Accordingly, the State's noncompliance with discovery does not require reversal by this court.

■ Defendant next contends that the State wilfully and intentionally prevented defendant from obtaining testimony from David Green by not offering Green immunity until after defendant's trial. Although the right to call witnesses in one's behalf is essential to due process, a defendant cannot require the State to grant immunity to a defense witness so that the defense may obtain testimony which it deems relevant. (*People v. Hamm* (1985), 136 Ill. App. 3d 11, 23, 482 N.E.2d 1103; *People v. Frascella* (1980), 81 Ill. App. 3d 794, 798, 401 N.E.2d 1045.) Also, a defendant possesses no constitutional sixth amendment right to compel the State to confer immunity upon witnesses of defendant's choice. *People v. Hamm* (1985), 136 Ill. App. 3d 11, 23, 482 N.E.2d 1103; *People v. Gomez* (1982), 107 Ill. App. 3d 378, 384, 437 N.E.2d 797.

■ Here, defendant has not even made a sufficient showing that Green would have refused to testify without immunity. Since Green was not implicated in the crimes for which defendant was being tried,

there would appear to be no reason for him to invoke the privilege against self-incrimination if called by defendant to testify. The record shows defendant was aware of Green's potential as a witness and that, in fact, he had interviewed Green prior to trial. Although defendant alludes in his brief to the fact that the State and defendant agreed Green was concealing information about the murder of Thompson, no basis for this allusion exists in the record. Thus, we believe defendant's election not to present Green as a defense witness can be considered a tactical decision of his own and cannot be attributed to the State's failure to grant Green immunity.

Furthermore, the testimony which defendant claims Green would have presented, if granted immunity, involves statements made by Sanchez to Green regarding defendant's participation in the crimes. It is defendant's contention that these statements would corroborate defendant's testimony regarding what actually occurred in Sanchez' house. However, as the State correctly notes, Green's testimony, had he testified as to what Sanchez said to him, would have constituted inadmissible hearsay. Further, as discussed below in this opinion, even if this testimony had been admissible, it would not have been relevant to defendant's defense.

■ Next, defendant claims that Green's statements to an F.B.I. agent after Green was granted immunity following defendant's trial constitute newly discovered evidence. According to defendant, if Green had been granted immunity and permitted to testify at defendant's trial, his testimony would have corroborated defendant's testimony regarding the events at Sanchez' house.

As noted above, Green's testimony would not have been as to matters within his direct knowledge but only as to statements allegedly made to Green by Sanchez. As such statements would constitute inadmissible hearsay, they could not constitute new evidence. Further, an examination of Green's statement to the F.B.I. reveals it does not contain evidence warranting a new trial.

In *People v. Molstad* (1984), 101 Ill. 2d 128, 461 N.E.2d 398, our supreme court noted the standard for determining whether evidence discovered after the conclusion of a trial warrants a new trial:

> " 'To warrant a new trial, the new evidence must be of such conclusive character that it will probably change the result on retrial, that it must be material to the issue but not merely cumulative, and that it must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence.' " (101 Ill. 2d 128, 134, 461 N.E.2d 398, quoting *People v. Baker* (1959), 16 Ill. 2d

364, 374, 158 N.E.2d 1.)

Green's statement to the F.B.I. is not of such character that it would probably produce a different result in a subsequent trial. The only relevant information in Green's statement is to the effect that defendant was shaking on the way to Wisconsin to dump the victim's body. Defendant himself testified as to this fact, and it in no way was conclusive of either his guilt or innocence.

Also, rather than corroborating defendant's testimony, Green's statement contradicted defendant's testimony and reinforced defendant's participation in the crimes charged. Green's statement implied that defendant was in control of the victim while Sanchez was in the alley with Valentine and also while Sanchez was driving to his house. Additionally, the statement brings defendant's credibility into issue by noting that Sanchez told Green he did not know what defendant was doing when the victim escaped from Sanchez' house. Defendant had testified that at the time the victim escaped he and Sanchez were outside moving their cars.

A motion for a new trial on the ground of newly discovered evidence is to be scrutinized carefully, is addressed to the sound discretion of the trial court, and will not be reversed absent an abuse of discretion. (*People v. Sullivan* (1981), 95 Ill. App. 3d 571, 574, 420 N.E.2d 474.) Here, based on the contents of Green's statement and in light of all of the testimony and evidence introduced at trial, the "newly discovered evidence" was not of such an affirmative character as to lead to a different result in a new trial. The trial court did not abuse its discretion in denying defendant's motion for a new trial.

■ Defendant next argues that the State used its peremptory challenges to systematically exclude blacks from the jury and, thus, deny defendant a fair trial. The State maintains that the defendant has failed to establish that systematic exclusion of black jurors occurred and that, at any rate, peremptorily excusing blacks is not unconstitutional.

A defendant is not entitled to a jury of any particular composition, but the pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community. (*Taylor v. Louisiana* (1975), 419 U.S. 522, 538, 42 L. Ed. 2d 690, 703, 95 S. Ct. 692, 702.) Once the jury pool is selected, a prosecutor may exercise his peremptory challenges to eliminate blacks from the jury. (*Swain v. Alabama* (1965), 380 U.S. 202, 223, 13 L. Ed. 2d 759, 774, 85 S. Ct. 824, 837; *People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202.) If, however, a defendant shows that the facts and circumstances in this particular case raise an inference that the prosecutor used his

peremptory challenges to exclude blacks from the jury on account of their race, a constitutional issue is raised. (*Batson v. Kentucky* (1986), 476 U.S. ___, ___, 90 L. Ed. 2d 69, 83-84, 106 S. Ct. 1712, 1719-20.) Defendant has the burden of raising the necessary inference of purposeful discrimination (476 U.S.___, ___, 90 L. Ed. 2d 69, 85-86, 106 S. Ct. 1712, 1721.) Once the defendant has made the requisite showing of purposeful discrimination, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. 476 U.S. ___, ___, 90 L. Ed. 2d 69, 86, 106 S. Ct. 1712, 1721.

■ The record indicates that the State peremptorily excused three prospective black jurors. No determination can be gleaned from the record concerning why the first two blacks were excused, as defendant has failed to identify these individuals. Without specifically naming these two prospective jurors, this court has no method of ascertaining from those questioned during the *voir dire* which prospective jurors were black.

When defense counsel objected to the State's alleged systematic exclusion of black jurors, the trial court specifically noted that based on the responses of the first two prospective black veniremen, the State's exclusion of them was legitimate. As to Mr. Kirk, the third black excused by the State, the court commented that it found nothing objectional in Kirk's responses and asked the State to articulate its reasons for excluding him. The prosecutor pointed out that Kirk had quickly responded to all questions put forth to him by the court except for the question dealing with whether he would find the defendant guilty if the State proved guilt beyond a reasonable doubt. Additionally, the prosecutor noted that Kirk was a controller and that it was the prosecutor's belief that individuals with a propensity for detail and meticulousness, such as controllers or accountants, did not make good jurors in a criminal case. Thus, the prosecutor articulated a neutral explanation for excluding Mr. Kirk, as required by the Supreme Court's recent decision in *Batson v. Kentucky* (1986), 476 U.S. ___, 90 L. Ed. 2d 69, 106 S. Ct. 1712.

Upon the prosecutor's articulation of a neutral explanation, the trial court determined that factors other than Mr. Kirk's race could be the basis for the State's exclusion and, therefore, the exclusion would be permitted. Based on our reading of *Batson*, we believe the trial court's action here, in first seeking a neutral explanation from the prosecutor for his removal of a black on the venire and in then determining that the defendant had not established purposeful discrimination, was in keeping with the *Batson* decision.

It is essential in a jury trial that both sides be allowed in particular

cases to exercise peremptory challenges on any ground they select. (*People v. Williams* (1983), 97 Ill. 2d 252, 278, 454 N.E.2d 220.) To find that defendant's right to a fair and impartial jury was violated, defendant had to make some showing of systematic exclusion or purposeful discrimination. Defendant has offered no evidence to support his assertion other than an allusion to the fact that the case was highly susceptible to racism and that the State systematically excluded all blacks from the jury so as to exploit the racial issue of the kidnaping and murder of a white girl by a black man. This court cannot find systematic exclusion of blacks based on a mere allusion. *People v. Loggins* (1985), 134 Ill. App. 3d 684, 694, 480 N.E.2d 1293.

We conclude that evidence of the systematic exclusion of black jurors did not exist in this case and, therefore, defendant is not entitled to a new trial based on his claim that he was denied a fair and impartial jury.

■ Defendant next contends that his conviction for murder under an accountability theory must be reversed since he was merely present at Sanchez' house when the murder was committed and was continually opposed to the commission of any crimes.

Section 5—2(c) of the Criminal Code of 1961 provides that a person is legally accountable for the conduct of another when, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1983, ch. 38, par. 5—2(c).) While mere presence at the scene of a crime is not sufficient to make a person a principal in the crime (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 312, 475 N.E.2d 915), it is equally clear that one may aid or abet the commission of a crime, and thereby be held accountable, without actively participating in the crime (*People v. Ruiz* (1982), 94 Ill. 2d 245, 254, 447 N.E.2d 148, *cert. denied* (1983), 462 U.S. 1112, 77 L. Ed. 2d 1341, 103 S. Ct. 2465). A defendant's assistance during the crime can be inferred from acts he performs with the other party after the commission of the crime. (*People v. Fuller* (1980), 91 Ill. App. 3d 922, 929, 415 N.E.2d 502.) Moreover, the jury may consider the defendant's conduct in connection with other circumstances to conclude that the defendant was not merely a bystander but aided and abetted the crime. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 312, 475 N.E.2d 915.) Once a person becomes accountable for another's conduct, he remains so until he detaches himself from the criminal undertaking. *People v. Ruiz* (1982), 94 Ill. 2d 245, 256, 447 N.E.2d 148.

■ In the case at bar, the evidence was sufficient to show that

defendant was accountable for Sanchez' conduct and that at no time during the grisly events of the evening did defendant attempt to detach himself from the criminal enterprise, although as pointed out earlier in this opinion, defendant had several opportunities to depart the scene. The evidence adduced at trial established that defendant approached Valentine's car in D. Laney's parking lot along with Sanchez; that defendant tried to control Thompson when she became hysterical at the sight of Sanchez' gun; that defendant carried her, kicking and screaming to Sanchez' car; that while at Sanchez' house, defendant allowed Sanchez to rape Thompson and subsequently kill her; that defendant helped Sanchez carry Thompson's body upstairs and place it in the car, and that defendant dumped Thompson's body out of the car after he and Sanchez drove to Wisconsin.

Defendant's participation in the crimes was essentially a matter of defendant's credibility. Resolution of factual issues and the assessment of the credibility of witnesses is for the jury to decide, and this court will not reverse that judgment unless the evidence is so unsatisfactory or inconceivable that a reasonable doubt as to a defendant's guilt remains. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 309, 475 N.E.2d 915.) Such is not the case here. In order to doubt defendant's guilt the jury would have had to conclude that the testimony of all of the State's witnesses in particular Rene Valentine, Sam Siler, Gene Gonyo, and the F.B.I. agents, was incredible and that defendant's testimony, which differed from both his initial alibi and his subsequent 26-page typewritten statement to the F.B.I., constituted the truth. That the jury concluded otherwise and found defendant guilty of murder under an accountability theory was a proper determination.

■■■ Defendant's final contention is that the evidence was insufficient to prove him guilty beyond a reasonable doubt of felony murder. Liability under the felony murder doctrine requires that the victim be killed in the attempt or commission of a forcible felony. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3).) In the instant case, the underlying felony charge was the offense of aggravated kidnaping. Defendant contends that the charged felony terminated when Thompson momentarily escaped from Sanchez' house after her abduction. Although Thompson was recaptured, defendant argues that the State presented no evidence to show that defendant assisted in the victim's recapture, and, therefore, defendant could not be held accountable for the "second" kidnaping which resulted in Thompson's murder.

As the State correctly points out, the indictment charging defendant with aggravated kidnaping did not distinguish between a "first" and "second" abduction but rather referred to the crime of aggravated

kidnaping which occurred on or about February 4, 1984. Thus, the indictment was sufficient to include all actions of the defendant for the entire time cited in the indictment. Defendant presents no case law to support his bare conclusion that at some point during the evening one kidnaping ceased and another started. Moreover, the kidnaping was a continuing course of conduct despite defendant's attempt to show the victim "escaped." In actuality, the victim momentarily fled Sanchez' house. Her immediate recapture, while still bound by handcuffs and half-naked, reflects that no "escape," *i.e.*, "evasion of or deliverance from what confines, limits or holds" one (Webster's Third New International Dictionary 774 (1981)), occurred. The entire evening and early morning activities of Sanchez and defendant constituted one continuing course of conduct unbroken by any independent, intervening cause.

Additionally, defendant's claim that the State presented no evidence to show that he participated in the victim's recapture is inaccurate. Testimony by Gene Gonyo, Sanchez' neighbor, indicated that only 20 to 30 seconds transpired between the time he observed Sanchez struggling with Thompson in Gonyo's yard and Sanchez' return, alone, to Gonyo's house to explain the disturbance. According to Gonyo's testimony, it would have been impossible in such a brief time span for Sanchez to proceed from Gonyo's yard, through the obstructions and trees between the two houses, into Sanchez' house, and then back through the obstructions and trees to knock on Gonyo's door. Thus, Gonyo's testimony refuted defendant's claim that Sanchez acted alone in Thompson's recapture.

Moreover, by his own testimony, defendant was alone with Thompson while Sanchez was talking to Gonyo. Had defendant truly not been a party to the aggravated kidnaping and wanted to help Thompson, as defendant maintained throughout the trial, he could have seized this opportunity alone with the victim to accomplish her escape and his from Sanchez, or, at the very least, to phone for help. Thus, any contention by the defendant that he withdrew from the criminal enterprise after Michele Thompson's escape and, therefore, was not accountable for the aggravated kidnaping which resulted in her murder would be, in our view, frivolous. See *People v. Ruiz* (1982), 94 Ill. 2d 245, 447 N.E.2d 148.

Based on all the reasons given above, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

UNVERZAGT and SCHNAKE, JJ., concur.