NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210043-U

NO. 4-21-0043

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 2, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| DEBORAH WHITE, | ) | No. 18CF108 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) To the extent that defendant's objections to the prosecutor's closing and rebuttal arguments are not forfeited, the objections lack merit because the prosecutor's remarks were permissible argument.

(2) Absent evidence of bad faith, the State violated no discovery rule by voluntarily providing the defense a less than comprehensive nonverbatim summary of a police officer's oral statement.

(3) The circuit court did not abuse its discretion by sustaining the prosecutor's objection that defense counsel's recross-examination of a witness exceeded the scope of the preceding redirect examination.

¶ 2    In the circuit court of Vermilion County, a jury found defendant, Deborah White, guilty of aggravated battery of a peace officer (720 ILCS 5/12-3.05(d)(4) (West 2018)). The court sentenced her to 36 months of probation and to confinement for 180 days in the county jail. Defendant appeals on three grounds.

¶ 3         First, defendant argues that, in his closing argument and rebuttal argument to the jury, the prosecutor made improper remarks that justify a retrial. We hold that, to the extent these claimed errors are preserved for review, the prosecutor's remarks did not exceed the bounds of propriety.

¶ 4         Second, defendant complains of a discovery violation, which, she argues, made her trial unfair. Because we find no discovery violation, we find no abuse of discretion in the circuit court's denial of defendant's motion for a mistrial.

¶ 5         Third, defendant argues that the circuit court committed reversible error by limiting the recross-examination of a witness. Again, we find no abuse of discretion. Arguably, the recross-examination exceeded the scope of the preceding redirect examination—and, in any event, the record shows a lack of prejudice.

¶ 6         Therefore, we affirm the judgment.

¶ 7                              I. BACKGROUND

¶ 8                         A. Testimony in the Jury Trial

¶ 9         Ryan Birge testified that he was a police officer for the city of Danville, Illinois, and that on February 17, 2018, at 2 a.m., he was at Club Deuce. This was a local bar that was prone to disturbances. Around closing time, police officers routinely were dispatched to this bar "to try to stop any issues before they were started."

¶ 10         When Birge arrived at Club Deuce, a large, unruly crowd of about 75 people was in the parking lot. Two groups near a car were screaming at each other. Police officers approached the car, and Birge, who was in uniform, approached the crowd. He singled out the person in the crowd who was the loudest and moved toward him, intending to get him quieted down. This person's name, it later emerged, was Jacolby Bates. Birge testified that, upon arriving at Club

Deuce, he also noticed defendant as one of the more obstreperous bystanders in the parking lot. He identified her in court.

¶ 11    The prosecutor asked Birge:

"MR. STARNES [(ASSISTANT STATE'S ATTORNEY)]: At what point did you first see [defendant] there?

THE WITNESS: The first time I seen (sic) [defendant], the first time she stuck out when I noticed her was when there was an altercation going on behind me between Officer Sparling and a subject he was trying to take into custody. I was standing between him and the crowd. I couldn't help him, because the crowd was kind of closing in on us, and I wanted to try to keep them back. So I positioned myself in between him and the crowd. There was a male black that ended up being Jacolby Bates, and then [defendant] that were both yelling at us, amongst everybody else, but those two stood out.

Q. So Mr. Bates and [defendant] were both yelling at you?

A. The crowd was yelling at us, but those two just seemed to be the loudest. They were standing right directly in front and were hollering."

¶ 12    Birge testified that Sparling had a suspect on the ground, next to the car, taking him into custody, when the crowd "started throwing rocks and some other stuff." Trying to dissuade the crowd from moving toward Sparling, Birge kept yelling, " 'Danville Police, keep back[!]' " A chunk of concrete flew by Birge and hit the car, just above Sparling's head. The car revved its engine, Sparling rolled away from the car, and the car sped away. Another police officer, named Edington, "dive[d] out of the way right as the car shot past him, went through the crowd, and [exited] out onto the street."

¶ 13    As soon as the car left, Birge "turned back around, and the individual later identified as Jacolby Bates had completely closed the gap between [himself] and [Birge] and was starting to walk around [Birge]." It appeared to Birge that Bates meant "to get to Officer Sparling." Consequently, Birge laid his hands on Bates to arrest him for obstructing a peace officer. He told Bates that he was under arrest. Bates began to resist. As Birge had Bates bent over, wrestling with him, trying to get his arms behind his back, Birge "noticed something out of the corner of [his] eye." Birge continued in his testimony:

> "As I turned and looked, I seen (sic) [defendant] coming at me. She had her hand out an[d] the mace was already spraying at that moment. I think my quote exactly was, 'Oh sh***.' I turned my head. As I turned my head, she had already sprayed me on my right side of my face and my right eye. I turned. I still had ahold of Jacolby. *** I could see her hand stretched out. I could see her face plain as day, but I turned away from her."

Birge testified that not only was the flashlight attached to his uniform turned on but "[t]here was more than enough light in the parking lot, all the street lights and other lights, for [him] to see [defendant's] face very clearly."

¶ 14    Because Birge had been pepper-sprayed in a training exercise in the Police Training Institute, he knew what being pepper-sprayed felt like. It felt "like sand or shards of glass in your eye," and it burned the skin as well. Because he turned away in time, the pepper spray blinded only his right eye. He could still see out of his left eye. Another Danville police officer, Chelsey Miller, took over the handcuffing of Bates, saying, " 'Birge, I got him. I got him.' " Birge then scanned his surroundings for the woman who had just pepper-sprayed him.

¶ 15    He testified:

"I looked around, didn't see her, and when I turned, she turned and looked at me as she was getting into the passenger car. I yelled at her to stop. At that point, I'm shining my flashlight. I'm yelling, 'Danville Police, stop[!]'

* * *

*** When I yelled, she looked at me, I'm shining [the] flashlight, she got into the vehicle, and then of course I turned to the driver, yelling, 'Danville Police, stop[!]' The driver—the vehicle came towards me. Due to the aggression of the crowd and everything and driving the 3,000 plus pound vehicle towards me, I drew my weapon, and yelled, 'Danville Police, stop, stop[!] Put the car in park[!']  The driver stopped, and I told everybody to put their hands in the air. And after that, the driver was compliant and she put her hands up. Everything stopped right there. It was right then that Officer Sparling ran up to the car and then Officer Miller ran up to the car as well."

(This was a different car from the car that, earlier, sped away after getting hit with a chunk of concrete.)

¶ 16       The prosecutor asked Birge:

"Q. So you see the Defendant get into—about to get into a car. Do you remember anything about this car?

A. I don't remember. I'll be honest. I was more focused on her. She was— I mean, she had just maced me, so I wanted to get her into custody.

Q. Do you remember where in the car she got into?

A. She got into the passenger side of the vehicle."

¶ 17        Miller testified, too. According to her testimony, she saw Birge attempting to break up a fight between two men—subsequently identified as Bates and Aaron Moss—and she came over to help. As Miller approached, she saw "a female, black in a white shirt, walking away [from Birge] spraying what appears to be mace in the air." Miller was not close enough to get a look at the woman's face. There was a smell of pepper spray. Miller helped Birge with the apprehension of Bates, and Miller put Bates into a squad car. Then Miller returned to Birge, who now had his pistol drawn on a halted car.

¶ 18        Miller testified that, when she came over to the car, Birge told her, " 'She's right here. She's right here.' " Miller continued:

"I went to where he was pointing, which was the front passenger seat. I opened up the door. I asked the subject, ultimately identified as [defendant], to step out of the vehicle, and she refused.

Q. Now was that the same individual you had seen earlier spraying pepper spray?

A. Yes, it was.

Q. So you asked her to get out of the vehicle. Did she comply?

A. She did not.

Q. What happened next?

A. I drug her out of the vehicle.

Q. And placed her under arrest?

A. I did.

Q. And when you were placing her under arrest, did you notice anything in the vehicle?

A. Underneath her seat, I could see between the crack, kind of a little opening of the driver's seat where the floorboard is, there was a bottle of what appeared to be pepper spray, a black and yellow bottle."

After getting control of defendant, Miller removed the pepper spray bottle from the car. Miller identified People's exhibit No. 1 as the pepper spray bottle—which, she acknowledged on cross-examination, was never examined for fingerprints.

¶ 19        To return to Birge's testimony, defense counsel asked him on cross-examination:

"Q. Now you indicated earlier that you saw Mr. Bates and [defendant] when you first arrived yelling at officers?

A. Yes.

Q. You had a conversation with [the assistant state's attorneys] in preparation for this case, correct?

A. Yes.

Q. You didn't mention to them that you saw [defendant] yelling at officers when you arrived?

A. Yes, I did."

¶ 20        Also, on cross-examination, defense counsel asked Birge what defendant was wearing when she pepper-sprayed him. Birge answered that he did not remember. On redirect examination, the prosecutor asked Birge why he did not remember what defendant was wearing. Birge answered that he was looking at defendant's face and her outstretched arm instead of at her clothing.

¶ 21        Then, on recross-examination, defense counsel said:

- 7 -

"Q. I just want to go back to some testimony that you made earlier on initial direct. [The prosecutor] asked you if you remembered anything about the car you found [defendant] in.

MR. STARNES: Objection.

THE COURT: What's your objection[?]

MR. STARNES: Outside the scope of redirect.

THE COURT: The objection is sustained.

MR. BRAKKE [(DEFENSE COUNSEL)]: It goes to the questions regarding—regarding—that the State followed up on regarding—

THE COURT: You said it went to initial direct.

MR. BRAKKE: I know, Your Honor.

THE COURT: So that is sustained.

MR. BRAKKE: You said that you—at the car, you focused on the—on [defendant], and so you didn't know any details about the car.

MR. STARNES: Objection.

THE COURT: What's your objection[?]

MR. STARNES: Still outside the scope. It wasn't touched on redirect.

THE COURT: Sustained.

MR. BRAKKE: I'm going to ask for a sidebar, Your Honor.

THE COURT: No. The objection is sustained.

MR. BRAKKE: If I could have a moment.

THE COURT: Outside the scope."

¶ 22          After the State rested, defendant took the stand and testified on her own behalf. She acknowledged being in the parking lot of Club Deuce in the earning morning of February 17, 2018. She explained that, because she had been drinking that night, she had given her car keys to a friend. When fights broke out in the parking lot, her friend was still inside the bar, with the car keys. Defendant was waiting outside, near her car, which was still locked. Her friend came out of the bar and unlocked the car. Defendant got into the passenger side of the car, and her friend got into the driver's side. When police officers approached the car, defendant was sitting in the passenger seat. At the time, defendant had no idea what the police wanted with her. She denied hearing any police officer order her to stop before she got into the car. She denied pepper spraying any police officer. She testified that the can of pepper spray was not hers and that she had never seen it before. She admitted that Moss was her friend, but she denied being acquainted with Bates.

¶ 23                              B. Defendant's Motion for a Mistrial

¶ 24          During his cross-examination of Birge, when Birge testified that, upon first arriving at Club Deuce, he noticed defendant yelling in the crowd, defense counsel requested a sidebar conference. In the sidebar conference, defense counsel complained, "This is the first time I've heard anything about Officer Birge making any kind of sight or identification of [defendant] prior to the pepper spray incident." The prosecutor responded that Birge never wrote a police report on the incident (as Birge had admitted on cross-examination) and that the state's attorney's office had provided the defense a "summary," which, the prosecutor argued, did not have to be "verbatim."

¶ 25          Even so, defense counsel moved for a mistrial "based on the surprise." The prosecutor opposed the motion because (1) being a victim, Birge was not required to write a report; (2) when preparing for trial, the State did not always have a court reporter present, and, therefore, the State commonly wrote summaries; (3) the State provided the defense a summary of its meeting

with Birge; and (4) this is not a case in which the State failed to disclose an admission by the defendant. Defense counsel again complained: "There's no mention in the summary that I received of any statements he made about anything about when he arrives, other than his statement to go detain the male subject. They didn't—the State can afford [*sic*] discovery obligation by deciding they are not going to write stuff down."

¶ 26 The prosecutor disagreed that the fairness of defendant's trial depended on the State's having written down, for the perusal of the defense, everything a potential witness said. Instead of a mistrial, the correct remedy, the prosecutor suggested, would be to "impeach [Birge] that there is no documentation and argue that to the jury." The prosecutor contended, "There's no way that every single word that they testify to has to be disclosed before."

¶ 27 The circuit court denied the defense's motion for a mistrial.

¶ 28 C. The Prosecutor's Arguments to the Jury

¶ 29 In lieu of a comprehensive summary of the prosecutor's closing argument and rebuttal argument to the jury, we will confine ourselves to the four remarks of which defendant complains on appeal.

¶ 30 First, the prosecutor raised the question of who seemed "more likely" to be telling the truth: Birge and Miller on the one hand or defendant on the other hand.

¶ 31 Second, after asking, "Where is the doubt in this case?" the prosecutor argued that Birge and Miller had no doubt about their identification of defendant and that neither should the jury have any doubt.

¶ 32 Third, the prosecutor asked "[w]hat [was] more reasonable to believe": that the police officers risked their careers by lying on the witness stand or that defendant was drunk and that she pepper-sprayed Birge for interfering with her friends.

¶ 33　　　　　　Fourth, the prosecutor remarked that it was "absolutely terrifying and insidious" for a police officer to be "blinded with pepper spray" while attempting to arrest someone next to an unruly crowd, some members of which were violent, throwing cinder blocks.

¶ 34　　　　　　　　　　　　D. The Hearing on Defendant's Posttrial Motion

¶ 35　　　　　　In the hearing on defendant's posttrial motion, defense counsel argued that the circuit court had erred by denying the defense's motion for a mistrial. Defense counsel acknowledged that, in its pretrial discovery response, the State provided a summary of Birge's oral statement. According to defense counsel, however, the summary omitted to mention that, before defendant approached Birge with the pepper spray, Birge saw her yelling at police officers. Defense counsel claimed that this omission required the declaration of a mistrial on the ground of unfair surprise. He maintained that, although the State was "allowed to provide summaries rather than verbatim statements," the State was forbidden to "pick and choose which facts [would] be summarized." Defense counsel insisted that the State could not "avoid its discovery obligations by deciding not to write anything down." In defense counsel's view, "any claim that such statements [were] not subject to disclosure because they were not written down [was] a tactic meant to avoid disclosure."

¶ 36　　　　　　The State opposed defendant's posttrial motion. The prosecutor said he had a copy of the e-mailed disclosure to which defense counsel was referring. The prosecutor argued that, after meeting with Birge, the State

> "provided a summary, a detailed summary of what he had told us and what he was expected to testify to, which included him saying he saw [defendant] approaching, he turned to look at her and saw her holding a can of mace. He said he saw her spray the mace and he turned away, it hit his face. He said he was able to see the

defendant leaving through the crowd with another eye. He also saw her getting in a car.

That was—and, Your Honor, what they are talking about would really be a collateral issue about her yelling at the police. And the defense acts like there is no remedy here. *** There was a stipulation Your Honor can see in the emails that we would agree for impeachment purposes that they could use this summary to impeach Officer Birge and that's their remedy.

They are thinking that there is some detail left out of the summary, which can occur, and they are saying that this was a very important detail. They can cross-examine the officer with that and then point out that you didn't include it in your report. This wasn't a super—this wasn't an important detail that needed to be laid out in the summary."

¶ 37    Without objection by the defense, the circuit court admitted the summary as "People's Exhibit No. 1 *** for purposes of this hearing." The court then denied defendant's posttrial motion.

¶ 38                                   II. ANALYSIS

¶ 39    A. Alleged Improprieties in the Prosecutor's Arguments to the Jury

¶ 40                        1. *Asking Which Account Is "More Likely"*

¶ 41    In his closing argument to the jury, the prosecutor posed the question of which account seemed "more likely": that defendant pepper-sprayed Birge and then threw the can of pepper spray onto the floorboard under her feet when she got into her car or, alternatively, "that she just happened to be unlucky, sitting on top of a pepper spray can that she had no idea was in

her car." Defense counsel objected, "This is a lowering the burden argument." The circuit court overruled the objection.

¶ 42    Defendant argues that the overruling of defense counsel's objection was an abuse of discretion. See *People v. Taylor*, 2019 IL App (3d) 160708, ¶ 31 (holding that the circuit court's "determination of the propriety of the remarks [the prosecutor made in a closing argument] will not be disturbed absent an abuse of discretion" (internal quotation marks omitted)). In defendant's view, by asking the jury to decide which version of the facts was "more likely"—the State's version or defendant's version—the prosecutor lightened the State's burden of proof from beyond a reasonable doubt to mere probability. "The right to due process, as guaranteed by the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2), safeguards an accused from conviction except upon proof beyond a reasonable doubt of every fact necessary to prove each element that constitutes the crime charged." *People v. Murray*, 2019 IL 123289, ¶ 28. Proof beyond a reasonable doubt is a higher, more rigorous standard than proof by a preponderance of the evidence. *People v. Green*, 2017 IL App (1st) 152513, ¶ 69. A prosecutor may not make remarks to the jury that lighten the State's burden of proof. *People v. Reyna*, 289 Ill. App. 3d 835, 840 (1997).

¶ 43    But the prosecutor never argued to the jury that, if Miller and Birge's accounts were more likely to be true than defendant's account, the jury should, for that reason alone, find White to be guilty. Such an argument—which the prosecutor never made—would have been misleading. See *People v. Crossno*, 93 Ill. App. 3d 808, 821 (1981). "The test is *** not which side is more believable, but whether, taking all of the evidence in the case into consideration, guilt as to every essential element of the charge has been proven beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* at 822. In other words, the test is not which side is probably telling the truth.

Rather, the test to be applied by the jury is, Did the State prove the elements of the charged offense beyond a reasonable doubt?

¶ 44      It does not follow, however, that the probability of defendant's lying is irrelevant to the test. As the State points out, "[p]rosecutors may comment on the credibility or persuasiveness of the defendant's theory of the case." *People v. Holman*, 2019 IL App (5th) 160207, ¶ 50. Characterizing a defendant's account as improbable is a way of challenging its credibility and persuasiveness. "[S]imply asking jurors to use their common sense and to conclude that *** a scenario was improbable" is "effective and permissible advocacy." *People v. Anderson*, 2018 IL App (4th) 160037, ¶ 53. A "prosecutor could legitimately argue the improbability of [the defendant's] explanations." *People v. Wilson*, 92 Ill. App. 3d 370, 382 (1981). From the improbability of the defendant's explanations, a jury could infer dishonesty—and a "defendant's lies are evidence of his [or her] consciousness of guilt." *People v. Mister*, 2016 IL App (4th) 130180-B, ¶ 113. Therefore, the circuit court did not abuse its discretion by overruling the objection to the prosecutor's argument that Miller and Birge were "more likely" than defendant to be telling the truth. See *Taylor*, 2019 IL App (3d) 160708, ¶ 31.

¶ 45      2. *The Argument That the Police Officers Had No Doubt*

¶ 46      At the beginning of his rebuttal argument, the prosecutor asked, "Where is the doubt in this case?" The prosecutor observed that Birge had no doubt about his identification of defendant as the person who had pepper-sprayed him. "Neither should you," the prosecutor argued to the jury. Next, the prosecutor asked if Miller had any doubt about her testimony that she found defendant in the passenger seat of the car and that "[u]nderneath that passenger seat was mace." "No," the prosecutor said in answer to his own question. "There is no doubt in this case whatsoever," he argued.

¶ 47 Defendant maintains that those remarks by the prosecutor "created confusion about what constituted 'reasonable doubt,' " equating a lack of doubt in the police officers' minds with a lack of reasonable doubt at trial. According to defendant, the prosecutor "strongly implied to the jurors that the 'doubt' that they must consider is that of the witnesses—there is only 'reasonable doubt' regarding a defendant's guilt if the identifying witnesses doubt their own identification." "Here again," in defendant's view, "was a clear misstatement of the burden which the prosecution faced in proving their case."

¶ 48 The State responds that, because defense counsel never objected to the prosecutor's remarks that Birge and Miller were free of doubt in their identification of defendant, any claim of error in those remarks is forfeited. In our review of this part of the trial transcript, we do not see any objection by defense counsel. The law is clear. "*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.) *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Accordingly, we hold this contention of error to be forfeited.

¶ 49 Forfeiture aside, we disagree with defendant that, by arguing to the jury that it should have no doubt because Birge and Miller had no doubt, the prosecutor purported to "explain[ ] the concept of 'reasonable doubt' to the jury." Nor did the prosecutor say or imply to the jury that finding the elements of the offense to be probably true would justify a guilty verdict. Rather, the prosecutor ended his closing argument by claiming, "[I]it is clear beyond a reasonable doubt that [defendant] *** pepper sprayed Officer Birge, that that caused bodily harm to [him], that is was insulting and provoking." Then, in his rebuttal argument, the prosecutor concluded by saying, "So ask yourselves. What does common sense tell you? Where is the doubt? The answer should be that there is none. This Defendant is guilty beyond a reasonable doubt. Find her guilty."

Thus, the prosecutor kept the standard of proof beyond a reasonable doubt prominently in the jury's view. After legitimate appeals to reasonableness, likelihood, and common sense, the prosecutor concluded with the governing standard of proof beyond a reasonable doubt.

¶ 50                        3. *Asking "What Is More Reasonable to Believe"*

¶ 51            Also in his rebuttal argument, the prosecutor asked the jury "[w]hat [was] more reasonable to believe": that the police officers had inexplicably risked their careers by lying on the witness stand or that defendant "was drunk and pissed off that the officers were hassling her friends, so she was going to do something about it." Defense counsel said, "Objection; mischaracterizes defense argument." The circuit court said, "Overruled. This is argument."

¶ 52            On appeal, defendant claims that the question "What is more reasonable to believe?" "further obfuscated the term 'reasonable doubt.' " The prosecutor "implied that the question the jurors should be asking themselves was whether the defendant's story was 'more reasonable' than the prosecution's—another clear misstatement of the prosecution's burden of proof," according to defendant.

¶ 53            But we cannot reasonably expect the circuit court to have sustained a particular objection that was never made. Defense counsel objected to the prosecutor's reasonableness argument on the ground that it mischaracterized the defense's argument, not on the ground that it obfuscated the term "reasonable doubt." An objection on a specific ground forfeits all other, unspecified grounds of objection. See *People v. Kelley*, 2019 IL App (4th) 160598, ¶ 86.

¶ 54            In her reply brief, defendant contends that, even if defense counsel failed to preserve this issue for appeal, "substantial defects are not waived by failure to make timely objections thereto." Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013). Merely quoting from Rule 451(c),

however, does not explain how the prosecutor introduced a substantial defect into the trial by posing a question of reasonableness.

¶ 55        4. *The Objection That the Prosecutor Called for Sympathy*

¶ 56        The prosecutor argued to the jury that the police officers were in the midst of 50 to 100 people outside the tavern, "[f]ights were breaking out everywhere," and even a cinder block was thrown. The prosecutor continued: "As scary and terrifying as that must have been for someone like Sergeant Kizer or someone like Officer Birge, then to be blinded with pepper spray while you're in the middle of that is absolutely terrifying and insidious." (Counts I and III of the information charged defendant with the aggravated battery of Danville police officer Eric Kizer, alleging bodily harm in count I and insulting or provoking contact in count III. Counts II and IV charged defendant with the aggravated battery of Birge. While finding defendant guilty of counts II and IV, the jury acquitted her of counts I and III—perhaps because Kizer testified that he did not see who had pepper-sprayed him.) In response to the prosecutor's "absolutely terrifying and insidious" comment, defense counsel said, "Your Honor, I'm going to object. He's calling for sympathy and prejudice here." The circuit court overruled the objection—again, because "[t]his is argument."

¶ 57        Defendant argues that the overruling of this objection likewise was an abuse of discretion. She quotes from *People v. Johnson*, 208 Ill. 2d 53, 87-88 (2003): "Our system of justice requires that a defendant's guilt or innocence be determined based upon relevant evidence and legal principles, upon the application of reason and deliberation by a jury, not the expression of misdirected emotion or outrage by a mob."

¶ 58        As the State notes, however, "[a] prosecutor may properly denounce a defendant's behavior" and may "engage in some degree of invective" (internal quotation marks omitted)

(*People v. Gonzalez*, 388 Ill. App. 3d 566, 595 (2008)) in "comment[ing] on the evil effects of the crime" (internal quotation marks omitted) (*People v. Holmon*, 2019 IL App (5th) 160207, ¶ 51). Granted, the invective can be overdone to the point that it is inflammatory, but we are unconvinced that it was overdone in this case. This case is hardly comparable to *Johnson*, in which the prosecutor's appeals to the jury's emotions were extreme and sustained, pervading the trial.

¶ 59 Besides, the prosecutor's brief characterization of defendant's misconduct as "absolutely terrifying and insidious" need not be regarded as mere invective calculated to arouse the jury's emotions. The characterization addressed an element of the charged offense. To commit aggravated battery, defendant had to commit battery. See 720 ILCS 5/12-3.05(d)(4) (West 2018). To commit battery, she had to "make contact of an insulting or provoking nature with *** Birge," as alleged in count IV. See *id.* § 12-3(a)(2). Arguably, that the pepper-spraying of Birge was "absolutely terrifying and insidious" in the dangerous circumstances of the melee outside the tavern made this inherently unpleasant contact all the more provoking to Birge. Therefore, we find no abuse of discretion in the overruling of defense counsel's objection that the prosecutor was "calling for sympathy and prejudice here." Rather, the prosecutor could be understood as explaining "why the evidence and law compel[led] a favorable verdict" on count IV. (Internal quotation marks omitted.) *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 60 B. The Alleged Discovery Violation

¶ 61 1. *The Sufficiency of the Record*

¶ 62 Defendant claims that the circuit court abused its discretion by denying her motion for a mistrial. See *People v. Musgray*, 37 Ill. App. 3d 48, 51 (1976). Citing *People v. Szabo*, 94 Ill. 2d 327, 348 (1983), defendant argues that "[t]he State *** cannot avoid discovery obligations merely by deciding not to write things down." "The goals of pretrial discovery," defendant says,

- 18 -

quoting from *People v. Rubino*, 305 Ill. App. 3d 85, 87 (1999), "are 'to eliminate surprise and unfairness and to afford an opportunity to investigate.' " Also, quoting from *People v. Eliason*, 117 Ill. App. 3d 683, 694 (1983), defendant argues that "[f]ailure to disclose an inculpatory statement until trial has begun 'improperly and unfairly deprive[s]' a defendant of the opportunity to properly prepare for it and to 'test its admissibility.' "

¶ 63        The State's initial response to this discovery issue is that, because the record on appeal lacks the summary that the prosecutor e-mailed to defense counsel, the record is insufficient to address this issue and, consequently, we should resolve the doubt against defendant by presuming that the circuit court ruled correctly. See *People v. Stewart*, 179 Ill. 2d 556, 565 (1977); *People v. Peters*, 144 Ill. App. 3d 310, 315 (1986).

¶ 64        Although the record appears to lack the e-mail, the prosecutor's arguments in the hearing on defendant's posttrial motion implied that defense counsel's assertion was true: that the summary of Birge's oral statement never mentioned defendant's yelling at the police before the pepper-spraying incident. The prosecutor argued to the circuit court that this earlier sighting of defendant by Birge "wasn't an important detail that needed to be laid out in the summary" and that, besides, if "some detail [is] left out of the summary, which can occur," defendant's remedy was to impeach Birge about the omission. Those arguments by the prosecutor presupposed that the omission of which defense counsel complained was real. Therefore, even though the e-mail is not in the record, we regard the record as sufficient to address the discovery issue.

¶ 65                2. *Providing the Defense a Less Than Comprehensive*

*Summary of Birge's Oral Statement*

¶ 66        Under Illinois Supreme Court Rule 412(a)(ii) (eff. Mar. 1, 2001), the State has an obligation, upon written motion by the defense, to disclose "any written or recorded statements

- 19 -

and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements." Thus, if the person who made an oral statement was the defendant or a codefendant, the State must comply with a written motion by the defense to disclose the substance of the statement.

¶ 67 But if the person who made the oral statement was someone other than the defendant or a codefendant, the State need not disclose the substance of the statement unless the report of the oral statement is "substantially verbatim." Ill. S. Ct. R. 412(a)(i) (eff. Mar. 1, 2001). Rule 412(a)(i) provides as follows:

> "(a) Except as is otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:
>
> > (i) the names and last known addresses of persons whom the State intends to call as witnesses, together with their relevant written or recorded statements, memoranda containing substantially verbatim reports of their oral statements, and a list of memoranda reporting or summarizing their oral statements. Upon written motion of defense counsel memoranda reporting or summarizing oral statements shall be examined by the court in camera and if found to be substantially verbatim reports of oral statements shall be disclosed to defense counsel ***."

We are unaware of any "written or recorded statement[ ]" by Birge. *Id.* We likewise are unaware of any "memorand[um] containing [a] substantially verbatim report[ ]" of Birge's oral statement. *Id.* Therefore, the State appears to be correct that, by voluntarily e-mailing the summary to the

defense, the State went beyond the requirements of Rule 412(a)(i). The State has a point when it argues that it cannot logically be accused of a discovery violation if, in producing its nonverbatim summary of Birge's oral statement, the State did more than what the rule required.

¶ 68　　　　On the other hand, a distinction might be drawn between producing no memorandum at all and producing a memorandum that is materially incomplete and that could lull defense counsel into the false belief that the witness will have nothing further of importance to say when taking the stand. "[W]hen the failure to preserve a statement"—or a crucial part of a statement—"in written form amounts to an intentional tactic to prevent disclosure of relevant materials to a defendant, such action will not be condoned." *People v. Newman*, 211 Ill. App. 3d 1087, 1097 (1991). But the circuit court did not have to infer an intent by the State to surprise or mislead the defense just because the e-mail omitted to mention that Birge saw defendant in the crowd before she approached him with the pepper spray. The e-mail stipulated that it could be used for impeachment, thereby alerting the defense to the possibility that, in his testimony, Birge might provide more information than the e-mail. After all, summaries are, to varying degrees, selective, and when writing them, different people might have different views of what is essential. Because Birge was an important witness—a victim named in the charges—it might have been a good idea for defense counsel to interview him so that defense counsel could write his own summary. "The rules [of discovery] do not require that the State prepare the defendant's case." *People v. Abbott*, 55 Ill. App. 3d at 24.

¶ 69　　　　Because the State identified Birge as a witness whom it intended to call at trial, "we find that the rules of discovery [did] not require that the State reduce the substance of [his] pre-trial, oral statements to memoranda form prior to presenting him as a witness." *Id.* This case is distinguishable from *Eliason*, 117 Ill. App. 3d at 692, in which the State "fail[ed] to disclose an

oral statement made by [the] *defendant* to [a police officer] after his arrest and after he had requested counsel." (Emphasis added.) Compare Ill. S. Ct. R. 412(a)(i) (eff. Mar. 1, 2001) with Ill. S. Ct. R. 412(a)(ii) (eff. Mar. 1, 2001). Given that Rule 412(a)(i) did not require the State to write the memorandum of Birge's statement in the first place, the circuit court could have reasonably found no discovery violation. Nor did the court have to find any bad-faith machination by the State. The court could have reasonably concluded that the author of the memorandum made an honest judgment call about what was needed to convey the substance of Birge's oral statement. Thus, we find no abuse of discretion in the denial of defendant's motion for a mistrial. See *Musgray*, 37 Ill. App. 3d at 51.

¶ 70                    C. Beyond the Scope of the Redirect Examination

¶ 71          Defendant maintains that the circuit court erred by sustaining the prosecutor's beyond-the-scope objection during defense counsel's recross-examination of Birge. Citing *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 105 (1995), defendant argues that "[c]ross-examination is an important tool to highlight flaws and omissions in the evidence presented during direct examination" and that "curtailing cross-examination of a key witness poses a significant danger of prejudicing a defendant's case." (Internal quotation marks omitted.)

¶ 72          As the supreme court noted in *Leonardi*, however, cross-examination should be limited to the scope of the immediately preceding direct examination (and, similarly, recross-examination should be limited to the scope of the immediately preceding redirect examination). "[C]ross-examination," the supreme court explained, "is generally limited to the scope of the direct examination. However, circumstances resting within the witness'[s] knowledge may be developed on cross-examination that explain, qualify, discredit, or destroy the witness'[s] direct testimony, even though that material may not have been raised on direct examination." *Id.*

at 105-06. Thus, on recross-examination, a party is not limited to the same material that the opposing party raised on redirect examination, but the material that the party raises on recross-examination must tend to "explain, qualify, discredit, or destroy" the testimony that the witness gave on redirect examination. *Id.*

¶ 73 "[T]he scope of cross-examination rests within the sound discretion of the trial court and will not be disturbed on appeal absent abuse of that discretion." *Id.* at 102. The circuit court abused its discretion only if its ruling was unreasonable, arbitrary, contrary to law, or clearly illogical. See *People v. Couch*, 387 Ill. App. 3d 437, 444 (2008). A reasonable person could take the view that Birge's inability to remember what the car looked like that defendant climbed into had no tendency to "explain, qualify, discredit, or destroy" Birge's testimony that he was unable to remember what defendant was wearing because his attention was focused on her face and her outstretched arm. The point of the redirect examination was that Birge experienced tunnel vision, so to speak. Arguably, his inability to remember what the car looked like would tend to confirm rather than negate his claimed experience of tunnel vision. See *Leonardi*, 168 Ill. 2d at 105-06. Therefore, again—applying the most deferential standard of review recognized by the law (*In re D.T.*, 212 Ill. 2d 347, 356 (2004))—we find no abuse of discretion in the sustaining of the beyond-the-scope objection (see *Leonardi*, 168 Ill. 2d at 102).

¶ 74 In any event, if the evidentiary ruling was erroneous, the error was harmless. See *People v. Richardson*, 401 Ill. App. 3d 45, 54 (2010) (holding that "[a]n erroneous evidentiary ruling by a trial court requires reversal only where it can be said that the error played a substantial part in the verdict"). Birge already had testified on direct examination that he could remember nothing about the car. Having him say so again would have added no new information to the trial.

¶ 75                                  III. CONCLUSION

¶ 76        For the foregoing reasons, we affirm the circuit court's judgment.

¶ 77        Affirmed.